SCHWANDER, et al. *v.* RUBEL, et al.

No. 39224 October 18, 1954 75 So. 2d 45

*C. R. Bolton,* Tupelo; *Ben L. Shifrin,* St. Louis, Missouri, for appellants.

878

*Orma R. Smith,* Corinth, for appellees.

HOLMES, J.

. This case is before us on direct and cross-appeals from a decree of the Chancery Court of Alcorn County, approving, with certain exceptions, the final account of the executors of the estate of Abe Rubel, deceased.

Abe Rubel died on November 23, 1931, at the age of 81 years. His wife had predeceased him on March 28, 1931. He was survived by ten children, all of whom were adults and the youngest of whom was 35 years of age. His ten children were named as beneficiaries in his last will and testament which he executed on April 3, 1931, just a few days following the death of his wife. His daughter, Helen, died on July 27, 1932, without issue and without having received her share of the estate, and under a provision of the will was thereby eliminated as a beneficiary, leaving his nine remaining children as participants in equal proportion in his estate. At the time of his death he was a member of the firm of Abe Rubel and Company, a partnership composed of himself and his two older sons, Simon and Jake Rubel, engaged in the operation of a large department store in the City of Corinth, Mississippi, dealing in both retail and wholesale trade. He left a substantial estate of the approximate gross value of $300,000, consisting of his interest in the mercantile firm of Abe Rubel and Company, certain notes, stocks and bonds, insurance on his life payable to his estate in the amount of $40,000, and certain real estate, including, among other such property, his home in the City of Corinth, and an undivided one-half interest in the three-story store building in which the business of Abe Rubel and Company was conducted. In his will he expressed implicit confidence in his two older sons, Simon and Jake, and named them as the executors and trustees of his estate, providing that they be not required

to give any bond, or file any accounts, or make any settlements, annual or final, with any court, or file any appraisement or inventory of the estate. Simon and Jake promptly qualified as the executors of the estate and continued the joint administration thereof until January 4, 1946, when Jake died, and thereafter Simon continued the administration of the estate as the surviving executor. Jake was never married and died without issue, leaving a will which is not here involved.

On November 3, 1947, Mrs. Stella Schwander, one of Abe Rubel's daughters, filed an original bill in the Chancery Court of Alcorn County against Simon and the executors of Jake's estate, seeking an accounting and settlement in the matter of Abe's estate. The other children of Abe later joined Mrs. Schwander as complainants in the original bill. On the day following the filing of this original bill, there was filed the final account of the executors of Abe's estate. It is manifest from the comprehensive nature of the account that it had been in the course of preparation for sometime prior to the filing of the aforesaid original bill. The complainants filed exceptions to the final account, and the court, with the consent of the parties, heard the cause on the exceptions and the cause arising under the original bill as one cause. Upon the conclusion of the hearing the chancellor took the case under advisement, and after a lapse of approximately four and one-half years, rendered his decision, at which both sides feel aggrieved and bring their grievances to this Court.

The direct appeal here is by the complainants and the exceptors, hereinafter referred to as the heirs, complaining of the chancellor's adverse rulings on certain of their exceptions, and the cross-appeal is by the executors, complaining of the chancellor's rulings adverse to them.

The controversy involves not so much a question of figures and amounts as it does the question of the liability or non-liability of the executors with respect to cer-

tain items involved in the accounting and the right of the executors to certain allowances.

The record reflects a long course of harmonious dealings between members of a large family, closely knit by ties of affection, devotion and mutual confidence, and ultimately disrupted by honest differences over their respective property rights. It is out of such a situation that this litigation stems. We deem it pertinent, therefore, to note the development of the controversy as unfolded by the record.

Abe Rubel was highly regarded as a citizen and had a long and honorable career as a merchant. He entered the mercantile field in Corinth in 1876, in partnership with others. Through changing personnel in partnership relations throughout the period of years, the firm of Abe Rubel and Company evolved and at the time of his death on November 23, 1931, the firm, then composed of himself and his two sons, Simon and Jake, conducted the largest department store in Corinth and the adjacent trade territory. The credit rating of the firm was high, and throughout the years it had enjoyed a tremendous volume of business. At the time he made his will, to which reference will hereinafter be more specifically made, the country was facing the greatest financial depression of all times. Abe was then about 81 years of age. He necessarily knew that not many more years were allotted to him. He could not tell what the future would bring forth. He necessarily knew that in the event of his early death in the midst of the depression, the liquidation of the firm would be disastrous. He likewise necessarily knew that the immediate withdrawal of his investment or interest in the firm would be too great a burden upon his surviving partners in their efforts to carry on the business. He manifestly had a great pride in the firm of Abe Rubel and Company and the success which it had achieved through his efforts and that of his sons, Simon and Jake. He wanted to see the firm of Abe Rubel and Company

continued. He had absolute confidence in his sons who were his partners in the firm. Under these circumstances and in this environment he made his will. He made certain specific bequests and devises to certain of his children, providing that the same should be deemed advances against their respective shares in the estate. He named his ten children as the beneficiaries of his residue estate in equal proportion, providing that if any of them should die before receiving his or her share of the estate, the same should go to his or her issue, diminished by any advancement that might have been made to him or her by the executors under the terms of the will. He expressed implicit confidence in his two sons, Simon and Jake, and named them executors and trustees of his estate without the requirement of bond, accounting, or annual or final settlements, with any court, or the filing of any appraisement or inventory of his estate. By Item 6 of his will, he expressed the will and desire that the firm of Abe Rubel and Company continue, and that his investment remain therein just so long as in the sound judgment and discretion of his executors it was wise and profitable. By Item 7 of his will he provided that no beneficiary under his will should become a member of the firm of Abe Rubel and Company because of any inheritance or bequest thereunder without the consent of his executors and trustees acting within their discretion. Item 8 of his will provided as follows:

''I further direct that my said Executors and Trustees shall leave any interest that I may have in the firm of Abe Rubel and Company, located at Corinth, Mississippi, for a period of fifteen years, except the said firm of Abe Rubel & Company shall amortize said interest one-fifteenth each year starting one year after my death, said firm of Abe Rubel & Company to pay no interest thereof to my Executors and Trustees. In the event they desire to amortize the said estate within a shorter period, they may do so without the consent of any of the beneficiaries

or any court. In the event my Executors and Trustees desire to incorporate the firm of Abe Rubel & Company I hereby give them permission to distribute shares to my beneficiaries in the same proportion that they would receive if they had received my interest in the firm of Abe Rubel & Company direct from said firm.''

He authorized his executors to make advancements to his children and deduct the same from the share of such child in the final division and settlement of the estate.

By Item 11 of his will he provided as follows: ''I hereby confer full and unlimited power and authority upon my Executors and Trustees hereinafter named to sell and convey any or all of my property, real and personal, at such prices and on such terms and at such times as they, in their sound judgment, may see proper, and to execute and deliver proper deed or conveyance to same to transfer the title, and for this purpose I hereby convey said property to them and invest the title thereto in them, and in case either Executor or Trustee should die, then in that event I confer upon the survivor all the power and authority herein vested in both together, and he will exercise and execute same alone as sole Executor or Trustee. In case my Executors and Trustees make investments they shall take title as my Executors and Trustees to any property acquired.''

In naming his sons Simon and Jake as executors and trustees, he said: ''I have implicit confidence in them and confide to them, or to the survivor, absolutely this trust, without the supervision of any court anywhere.''

When Simon and Jake assumed the administration of the estate they kept no separate books for the estate, but the estate's accounts and the accounts of the heirs were run through the books of the firm. All books and records were kept by an experienced bookkeeper under the supervision of Jake, who, because of an asthmatic affliction, was required to spend eight or nine months of each year in Arizona or California. He returned, however,

for the remaining months of the year and checked and supervised the books, records, and accounts. Simon actively managed the business. Some of the sons clerked in the store regularly and received salaries which were credited to their respective accounts. Some of the daughters clerked periodically in the store during rush periods. The heirs drew indiscriminately and apparently without restriction merchandise and cash from the store, and the same was charged to their respective accounts on the books and were deemed advances against their respective shares in the estate. Statements of the merchandise so obtained from the firm were annually given or mailed to the heirs and the books were open and available to them for their inspection. The sums so advanced in merchandise and cash amounted in the aggregate to a large sum and at no time did the heirs claim the right to or demand the immediate distribution of amortized funds, nor did they claim any right to periodic or partial distributions of other funds of the estate, but on the contrary, they appeared content with their withdrawals from the store and acquiesced in this method of handling the distribution of the estate by the executors, except that in 1946, the decedent's son, Frank, a practicing attorney of New York City, while on a visit to Corinth, requested of Simon a settlement of the estate but took no action to obtain such settlement. Simon then undertook to agree with the heirs upon a settlement in accordance with the books but was unable to do so and was unable to agree with them upon an auditor to audit the books and records of the estate. Simon then employed the auditing firm of Homer K. Hones and Company of Memphis, Tennessee, and a Mr. Brugge was sent as their representative to make the audit. The heirs employed the auditing firm of Sidney Cohen of St. Louis, who sent a Mr. Seickmann to make the audit. The two auditors worked together and apparently there was no disagreement between them as to the figures, since there is no proof that Seickmann ques-

tioned Brugge's figures and the Seickmann audit was not offered in evidence. In making the audit, it developed that some of the ledger sheets for the period from December 31, 1931 to 1935, which had been accumulated in the safe, were inadvertently thrown away by Simon, and thus innocently destroyed as found by the chancellor. The books, however, according to the chancellor's finding, were otherwise accurately kept and all balances were shown as brought forward in the books, and Mr. Brugge was able to reconstruct the account by using as a basis the federal estate tax return filed by the executors. Mr. Brugge prepared a comprehensive report, purporting to show the assets and liabilities of the estate, and this account was filed as the final account of the executors, and it is this account to which exceptions were filed by the heirs. The account shows a distribution to the heirs of the amounts claimed by the executors to be due each respectively, with the exception of small balances due a few of them, and an overpayment of $5,073.97 to Lee Rubel, and a total over distribution of $469.48.

Some of the exceptions to the final account of the executors were withdrawn. We deal only with the controverted items and to these we now address ourselves.

■■■ Abe Rubel's investment in the firm as shown by the books, after applying certain adjustments thereto, amounted to the sum of $240,859.45. The executors in their accounting charged themselves with this amount, less a discount of 25 per cent thereof, leaving a net charge of $180,644.61. The executors contended that by agreement between the members of the firm of Abe Rubel and Company, as well as in accordance with custom prevailing among predecessors in prior partnership relations, the surviving partners were entitled to take over the interest of the deceased or retiring partner at a discount of 25 per cent. The heirs, while not seriously questioning the correctness of the sum of $240,859.45 as representing the value of Abe's investment or interest in the firm,

denied the right of the executors to account therefor at a discount of 25 per cent, and contended that the account of the executors should be surcharged with the difference between said sum of $240,859.45 and the sum of $180,-644.61, to-wit, the sum of $60,214.84. The chancellor sustained this contention and charged the executors accordingly with said sum of $60,214.84, finding that the sum of $240,859.45 represented the fair value of Abe's interest in the firm and that there was no competent proof of an agreement justifying the allowance of the claimed discount, and that a custom, if any, existing among partners in prior partnership relations was not binding upon the decedent's estate. We are of the opinion that the chancellor's findings are amply supported by the evidence and that his ruling was correct. The record reveals no competent proof of any agreement among the members of the firm which would justify the allowance of the claimed discount. ▮▮▮ Simon undertook to testify to such an agreement but objection to his testimony was correctly sustained upon the ground that he was incompetent to testify to establish his claim against the estate of a deceased person under the provisions of Section 1690 of the Mississippi Code of 1942. The executors, however, urged as proof of a custom justifying such discount, that there was a notation on the deceased's federal estate tax return and a recital in the articles of partnership executed by Simon and Jake in 1943 that such a custom had prevailed among partners in prior partnership relations. In addition to the fact that the notation on the federal estate tax return and the recital in the articles of partnership executed by Simon and Jake in 1943 amounted to nothing more than self-saving declarations, they were of no probative force to establish a custom binding upon the estate of the decedent. Furthermore, the proof offered to show such custom among partners in prior partnership relations showed no fixed pattern to establish such custom, but on the contrary showed

varying terms upon which surviving partners were permitted to take over the interest of the deceased or retiring partner. We, therefore, concur in the chancellor's action in disallowing the claimed discount and in charging the executors with the amount thereof.

The heirs vigorously contend that the executors should be charged with interest at the rate of six per cent per annum, compounded annually, on the funds of the estate coming into their hands and not promptly distributed. The basis of this contention is the claim that the executors violated the trust reposed in them in that they failed to keep adequate books and records, that they commingled the funds of the estate with their own funds and used them for their own benefit, and that they unreasonably delayed the settlement and distribution of the estate. The heirs argue that under the amortization provisions of the will it was the duty of the executors to amortize Abe's investment or interest in the firm one-fifteen each year and to forthwith distribute the same to the beneficiaries; that it was their duty to promptly distribute the insurance funds collected on the life of the deceased, and other individual assets of Abe's estate, including rents chargeable on Abe's undivided one-half interest in the store building in which the firm conducted its business. Hence the heirs say that the executors wrongfully delayed the distribution of these funds and are chargeable with interest thereon, as well as chargeable with interest on the $60,214.84 which the executors sought to take as a discount on the value of Abe's investment or interest in the firm.

■■ The will is not clear as to the time when distribution was required to be made. It does confer full and unlimited power and authority upon the executors and trustees to sell and convey any or all of the testator's property, real or personal, at such prices and on such terms and at such *times* as they, in their sound judgment, might see proper, and it authorizes the executors to make

reasonable advances to the children of the deceased and recognizes the right of the executors to make investments. These provisions would seem to indicate that partial distributions were not contemplated unless the amortization provision of the will be construed to mean that the testator's interest in the firm was to be amortized one-fifteenth each year and the amortized sum forthwith distributed to the heirs. The then attorney for the estate, the Hon. W. D. Conn, in a written opinion to the executors, advised them that such was not the construction to be placed upon the amortization provision, but that it was the apparent intention of the testator to have one-fifteenth of his interest in the firm earmarked each year for ultimate distribution at the expiration of the fifteen year period. One thing is manifest from the entire will and that is the testator's concern for the future of the firm of Abe Rubel and Company and his manifest desire that his surviving partners, who were his two trusted sons, should have the use of his interest in the firm for a substantial period of time to safeguard the business from the hazards of possible unfavorable economic conditions throughout a period of years following his death. The proof showed that the executors invested $35,000 of the insurance money in United States government bonds and accounted for the interest thereon. The proof further showed that all other interest actually received by the executors was accounted for. There is no proof that the executors actually used any of the funds of the estate for their personal or individual benefit. The proof further showed, as hereinbefore stated, that the heirs withdrew indiscriminately and without restriction merchandise and cash without protest or complaint as to this method of distribution and none of them requested other or further distribution until the deceased's son Frank requested a settlement in the early part of 1946, and thereafter the executors proceeded as expeditiously as was reasonably practicable to prepare

their final account and effect the final distribution of the estate. The chancellor found from the evidence that the executors had acted honestly and in good faith, that they had kept adequate books and records, and they had not wrongfully used the funds of the estate for their personal or individual benefit, that they had not unreasonably delayed the settlement and distribution of the estate, and that the withdrawals by the heirs of merchandise and cash without restriction, and their acquiescence in this manner of handling the estate by the executors showed a substantial compliance with the will, and he held that it would be inequitable in these circumstances to charge the executors with any interest. We think this finding by the chancellor is amply supported by the evidence and we are not warranted in saying that it was manifestly wrong. We need not and we do not undertake to divine the testator's intention under the amortization provision of the will, that is to say, whether he intended that the annual amortized amounts should be forthwith distributed to the heirs or whether they should be placed in a sinking fund for ultimate distribution at the expiration of the fifteen-year period. We think that the heirs acquiesced in the manner of the handling of the estate by the executors and we concur in the chancellor's conclusion that it would be inequitable to charge the executors with interest under the circumstances and facts as disclosed by this record.

 We are in full accord with the authorities relied upon by the heirs holding that an executor or administrator may be charged with interest where there ·is a showing of wrongdoing in dealing with the assets of a deceased's estate or a showing of a breach of the trust relationship. The authorities are agreed, however, that an executor or administrator is not chargeable with interest as a matter of course but may be so charged in particular circumstances, the matter being within the discretion of the court.

"At one time executors and administrators were not chargeable in any event with interest on the funds of the estate in their hands, but this rule has long since been abrogated, and it is now well settled that such charge may be made. Interest is not usually chargeable as a matter of course, but may be charged if the circumstances of the particular case require it, the matter being within the discretion of the court." 33 C. J. S., Sec. 209, p. 1194.

■■■■■■■ "An executor or administrator will not be charged with interest if it would be inequitable to do so under the circumstances." 33 C. J. S., Sec. 210, p. 1194.

"However, there is no inflexible rule requiring such a charge, and in cases where the executor or administrator has not actually received interest or used the funds of the estate for his own purposes, and has merely permitted them to lie idle when they might have been productively employed for the benefit of the estate, it is a matter of discretion with the court, on consideration of all the circumstances of the case, whether interest shall be charged. The important question is whether he has exercised good faith and due diligence as custodian of the particular fund; and in the absence of any governing statute, the courts are not inclined to charge a personal representative whose conduct has been honest and not unreasonable, and who has made no personal use of the fund, where the circumstances justified him in not actively investing or placing it at interest, and even where he was merely inert in failing to do so." 33 C. J. S., Sec. 211, p. 1195.

"The question of the personal liability of an executor or administrator for interest where there has been delay in closing up and settling the estate depends upon whether the delay was reasonable or unreasonable under the circumstances of the particular case." 30 Am. Jur., Sec. 22, p. 19.

"The mere fact of delay in closing up an estate does not of itself justify a charge of interest against the personal representative. The representative should not be charged with interest not actually received where the delay was not unreasonable under the circumstances of the case, . . ." 33 C. J. S., Sec. 213, p. 1197.

"As to whether an executor or administrator should be charged with interest on funds retained in his possession where the payment of a legacy or distributive share is delayed, there is no inflexible rule which the courts must follow. Ordinarily in the absence of statutory requirements, interest is not chargeable as of course, or as a matter of right; liability therefor depends upon the circumstances and is a matter in respect of which the trial court is vested with some discretion." Note, 18 A. L. R. 2d, p. 1390.

It is argued by the heirs, however, that the executors should in any event be charged with interest on the discount of $60,214.84 from the date the chancellor found the same to be chargeable to the executors. The charging of this sum to the executors was one of the results of the contest in the accounting proceedings. We think it clearly appears from the record that the contentions of the respective parties with respect to this and other items of accounting were made in good faith. The charging of this item to the executors did not arise out of any negligence or improper conduct imputable to the executors. None of the litigants were responsible for the prolongation of the litigation.

After a careful review of the question of the claimed liability of the executors for interest, we are convinced that the record in this case does not present such facts and circumstances as would warrant the assessment of interest against the executors, and certainly we are unable to say the chancellor in denying interest abused his discretion and was manifestly wrong.

It is next complained by the heirs that the chancellor erred in disallowing their claim to a pro-rata share of the profits on the testator's investment in the firm of Abe Rubel and Company subsequent to the testator's death and so long as his investment remained in the firm. We think the chancellor was correct. There is no provision in the will authorizing the heirs to participate in the profits of the firm earned after the death of the testator, and such participation is negatived by the express provision of the will that no beneficiary should become a partner in the firm because of any bequest or inheritance thereunder without the consent of the surviving partners. The surviving partners never consented for the beneficiaries to become members of the firm, and therefore the beneficiaries never became entitled to share in the profits of the firm either by virtue of membership therein or by virtue of any provision of the will.

A further contention of the parties arises out of the fact that Abe owned an undivided one-half interest in the three-story store building in which the firm conducted its business. The firm owned the other undivided one-half interest. Abe's interest was not carried on the books of the firm. The proof showed that for a long period of time the firm paid the taxes, insurance, repairs, and improvements on the property but Abe charged the firm no rent on his interest. Subsequent to Abe's death, the firm continued to use the property and to pay the taxes, insurance, repairs and improvements thereon, but the executors in rendering their final account accounted for no rent on the estate's undivided one-half interest. The executors contended that Abe had permitted the firm to use this property over a long period of years without claiming or demanding any rent on his interest therein and that during this period the firm had paid all taxes, insurance, repairs and improvements thereon, and that such action on the part of Abe constituted a contribution of the property to the firm, and that his interest in the

property was therefore included in his investment account. On the other hand, the heirs contended that they were entitled to a reasonable rental on Abe's one-half interest and that it was the duty of the executors to collect the same and that they should be charged therewith. The chancellor sustained the contention of the heirs, and, on conflicting evidence as to reasonable rental value, fixed the rent and charged the executors therewith. The executors complained that the chancellor erred in charging them with any rent, and the heirs complained that the rent fixed was inadequate. The evidence as to rental value was conflicting and the chancellor's determination thereof was amply supported by the proof.

We think the contention of the executors was not well founded. Abe's interest in the property was a part of his individual property and the fact that he permitted the firm to use it free of rent during his lifetime was not binding upon his estate or his heirs after his death. The firm never at any time in the lifetime of Abe asserted a claim to his interest in the property but recognized his ownership thereof. In charging the executors with rent on Abe's interest, the chancellor directed that there be offset against the same all sums paid for Abe's share of the taxes, insurance, repairs, and improvements on the property subsequent to Abe's death, except taxes for the year in which Abe died. We think the chancellor was correct and we concur in his action.

The heirs further complain that the chancellor erred in making an allowance to the executors of an attorney's fee for services rendered in the administration of the estate. It appeared from the evidence that the heirs had originally sued the executors in the Federal court to require an accounting and settlement; that this suit was dismissed, and that later a like suit was filed in the Chancery Court of Alcorn County; that legal services had been required and incurred by the executors to defend these suits as well as the exceptions to the final

account; that the litigation extended over a long period of time and involved extensive study and labor on the part of the attorneys; that the value of the estate involved was in excess of $300,000; that a fair fee for all such services was from $12,500 to $20,000. The chancellor held that the executors were entitled to the allowance of an attorney's fee for services allocable to matters of administration only; and that a fair fee for such services was $2,500, and he accordingly allowed this sum. We think this was a matter within the discretion of the chancellor. We do not find that the chancellor manifestly abused his discretion and his action in this matter will therefore not be interfered with.

Section 633 of the Mississippi Code of 1942 provides: "In annual and final settlements, the executor, administrator or guardian shall be entitled to credit for such reasonable sums as he may have paid for the services of an attorney in the management or in behalf of the estate if the court be of the opinion that the services were proper and rendered in good faith; . . ." The only limit prescribed in the statute for the allowance of an attorney's fee to an executor is that the same shall be in a reasonable sum to be fixed by the court if he be of the opinion that the services were proper and rendered in good faith. The allowance and the fixing of the fee are, therefore, matters addressed to the sound discretion of the chancellor. In King v. Wade, 175 Miss. 72, 166 So. 327, the Court said: "It is the settled rule in this State that the allowance of compensation and attorneys' fees to an administrator within the limits prescribed by statute is a matter addressed to the sound discretion of the Chancery Court, and this Court will not interfere with the exercise of that discretion except in cases of its manifest and flagrant abuse."

 It is also complained that the chancellor erred in assessing the court costs. He assessed the costs against the estate of the deceased and as a result thereof

each of the beneficiaries under the will is required to bear his or her proportionate part of the costs. We think this was likewise a matter addressed to the sound discretion of the court. He no doubt took into consideration that both sides prevailed as to certain contentions and lost as to others. While we may indulge our own ideas as to a more equitable distribution of the costs, it is not for us to substitute our judgment for that of the chancellor in matters committed to his discretion unless we are able to say that he abused his discretion, and this we do not feel warranted in saying.

Under Section 1583 of the Mississippi Code of 1942, the chancery court has power to decree that either party shall pay the costs of any suit in equity, or that the same may be divided as may be equitable. In Liberty Mercantile Co. v. Allen, 134 Miss. 354, 98 So. 774, this Court held that the chancery court has broad powers under the statute which provides that the court shall have power to tax either party with the costs or divide the same between the parties as may appear equitable, and that it must be an exceptional case for this Court to reverse a decree on account of the taxation of costs. In the case of Sledge v. Obenchain, et al., 59 Miss. 616, this Court held that in cases where costs are not a matter of right but may be allowed or denied at the chancellor's discretion, no appeal will lie from his decision unless it is an arbitrary exercise of power rather than of sound judicial discretion, and clearly wrong.

It is a further contention of the executors that the chancellor erred in declining to allow them any compensation. The chancellor refused compensation to the executors upon the ground that the will provided none and that they entered upon their duties without expectation of receiving compensation. In this we think the learned chancellor was in error. We are unable to reconcile his action with his finding that the executors acted honestly and in good faith and were guilty of no breach of trust

and did not unreasonably delay the distribution of the estate. Under the mandatory provisions of our statute, an executor or administrator is entitled to compensation within the limits of the statute unless he has forfeited his right thereto by his misconduct or an abuse of his trust. Where the will fixes the compensation and the executor assumes to act thereunder, he is bound by the compensation fixed in the will and the statute does not apply. Where the will fixes no compensation and the executor assumes to act thereunder, he is entitled to no compensation in the absence of a statute providing the same. We have such a statute. Section 642 of the Mississippi Code of 1942 provides that on final settlement "the court shall allow to an executor or administrator, as compensation for his trouble, either in partial or final settlements, not less than one nor more than seven per centum on the amount of the estate administered; in addition to which the court may allow him his necessary expenses."

In Walton v. Walton, 143 Miss. 666, 109 So. 707, we held that an executor or administrator should not be paid commissions on that part of the estate for which he did not account, but that as to that part of the estate which he accounted in good faith, he was entitled to commissions in the discretion of the court, within the limits prescribed by statute.

In Barry v. Barry, 198 Miss. 677, 21 So. 2d 922, it was held that where the will fixed the compensation and the executor assumed the duties of executor thereunder, he was bound by the compensation fixed in the will and the statute did not apply.

In Vicksburg Public Library v. First National Bank, 168 Miss. 88, 150 So. 755, it was held that the above quoted statute was to provide compensation where the will fixes none. In the light of the chancellor's findings and in view of the mandatory provisions of the statute, we think the executors were entitled to an allowance of

compensation. We think this compensation should be fixed within the limits of the statute on the gross personal estate actually accounted for by the executors in good faith. No allowance of commissions should be made to them on those sums with which the chancellor surcharged their account as a result of this contest.

In view of the foregoing conclusions, the decree of the court below is affirmed on direct appeal, and reversed on cross-appeal to the extent only that it denies compensation to the executors, and the cause is remanded only for further action by the chancellor in allowing compensation to the executors and fixing the same within the limits of the statute on the amount of the gross personal estate actually accounted for by the executors in good faith.

Affirmed on direct appeal; reversed in part on cross-appeal, and remanded.

All Justices concur except *Gillespie, J.,* who dissents in part.

GILLESPIE, J., dissenting in part.

I think the chancellor was in error in not charging the executors with simple interest on the large sums of money held by them undistributed and uninvested. In my opinion there is no legal justification for the long delay. The executors were fiduciaries and commanded a dominant position. Mere acquiescence on the part of the heirs should not relieve the executors of their duty to distribute the estate within a reasonable time. A discussion of the authorities upon which I base this dissent would serve no useful purpose; but anyone interested may find the applicable rules of law, established by the weight of authority, in the annotation following the case of American Jewish Joint Distribution Committee v. Eisenberg, 70 A. 2d 44, 18 A. L. R. 2d 1380. I may add **that it is not difficult** to defer to the majority opinion

which was reached after lengthy and scrupulous consideration.

I also dissent to the reversal of the case on cross-appeal for the allowance of fees to the executors. The executors should not be allowed compensation. Otherwise I concur with the majority.