LEWIS, et al. *v.* LATHAM, et al.

No. 39620        April 25, 1955        79 So. 2d 811

*Smith & Hurdle,* Holly Springs; *W. E. Wilroy,* Hernando, for appellants.

*Chatham & Walker,* Hernando, for appellees.

**LEE, J.**

Mrs. Mildred Bell Banks and others, owning a four-fifths interest in Black Ankle Plantation, by their bill, sought a partition of the property and to charge, against the respective shares, the proper proportion of expenses incurred by Mrs. Banks in making necessary repairs and improvements. John and Minor Latham, owning the other one-fifth interest, and other parties, who were susceptible of potential interests, were made defendants. Before the issues were settled, Mrs. Banks died, and the cause was thereafter properly revived.

The Lathams answered and joined in the prayer for partition. They made their answer a cross bill also and prayed for an accounting.

The complainants and cross-defendants, in obedience to the prayer of the cross bill, made a full disclosure, under oath, of all substantial dealings in connection with the operation of the plantation during the period of 1943 to 1952 inclusive; and alleged that the operations were carried on as an accommodation to the cross-complainants.

The proof disclosed that Mrs. Banks, following the death of her husband in 1909, owned about 12,000 acres of land in De Soto County, much of which she farmed. In addition, she owned and operated, in the Town of Hernando, Mississippi, a mercantile business, a building and supply business, and a cotton gin. Her trade name for these businesses was Banks and Company. She looked after these operations personally and through employees. Black Ankle Plantation consisted of about 2,200 acres of land. The owners were all close blood relatives. While Mrs. Banks originally held only a two-fifths interest therein, she managed the plantation as a unit in her operations. Her aunt, Mrs. Lou Latham, the mother of John and Minor Latham, lived in New York City. Following Mrs. Latham's death in December 1942, Mrs. Banks, who was then over seventy years of age, continued to operate the plantation with Miss Edna Davidson as manager.

There were about forty tenant families on the place. Land was rented to them at the customary rent of one-third of the cotton and seed, the landlord paying one-third of the cost of fertilizer, poison and ginning. Land for corn, hay and other crops was rent free. Banks and Company furnished the fertilizer and poison at the customary local prices, and also furnished the tenants with their supplies to make the crop. It ginned the cotton for the same prices as were charged by other gins in that area. When a tenant brought in seed cotton, Banks and Company, as soon as a bale was ginned, purchased it and the seed from the tenant, according to the

gin weights, at the price of cotton and seed in the Town of Hernando that day. From the gross amount of the sale, it deducted the cost of ginning, fertilizer and poison, and then credited Black Ankle Plantation with one-third of the remainder as rent. Subsequently, from time to time, it sold the cotton and seed, so purchased from the tenants, in Memphis, Tennessee.

From time to time, tenant houses, barns, cotton houses, etc. had to be rebuilt or repaired. Since such expenditures were not constant, they were set up for payment over a period of years. Banks and Company furnished all materials at current prices in Hernando, less ten percent.

Government and all other benefits, accruing to the plantation, were collected by Banks and Company and were properly credited.

Banks and Company paid all taxes and assessments. It made no charge for collecting and remitting the proportionate shares of net rents to the parties; but, commencing in 1943, it did charge for the proportionate salary and expenses of an employee, his horse feed, car expenses and depreciation, etc. in the supervision of the tenants.

At the end of the year, the books were audited, and checks were forwarded to the parties for their respective shares of the net income from the plantation.

The proof showed that Banks and Company, in most instances, did not sell the cotton and seed, which it purchased from the tenants, until several months later; and that, except for one year during the period, it made a profit over what it paid for the same.

The court below (1) rejected the accounting for the value of the cotton and seed as of the date of purchase from the tenants, and required such to be computed as of the date of sale in Memphis, less hauling, storage and commission charges, and also disallowed the one-third cost of ginning; (2) approved the expenditures for repairs and improvements, except $4,384.73 which was

expended for the construction of a large drainage ditch; (3) disallowed all claims for supervision; and (4) allowed interest at the rate of six percent per annum on all moneys from and after they became due, in accordance with the accounting. A decree was entered accordingly, and the original complainants appealed.

The appellants contend that the court was in error in each of its four conclusions.

As heretofore stated, the lands were rented to the several tenants under their agreement to pay one-third of the cotton and seed, with the landlord paying one-third of the cost of fertilizer, poison and ginning — the customary rental basis in that area. Consequently the relationship of landlord and tenant existed between the tenants and the owners of Black Ankle Plantation. Schlict v. Callicott, 76 Miss. 487, 24 So. 869; Alexander v. Zeigler, 84 Miss. 560, 36 So. 536; Williams v. Sykes, 170 Miss. 88, 154 So. 267 and 727. Now where the relationship of landlord and tenant exists, title to and possession of the crop is vested in the tenant, subject to the landlord's paramount lien to secure the payment of rent under Section 908, Code of 1942. See Williams v. Sykes, supra; Alexander v. Zeigler, supra; Opperman v. Littlejohn, 98 Miss. 636, 54 So. 77; Bethany v. State, 124 Miss. 870, 87 So. 410.

When a tenant brought in seed cotton, it was ginned and sampled. He had to pay the gin charges, satisfy the lien for rent, and pay for the supplies which had been furnished to him in order to make the crop. The value of both the lint cotton and the seed was determined by the then prevailing prices in the Town of Hernando, and thereupon Banks and Company purchased these agricultural products from the tenant at such prices. It deducted the cost of ginning, fertilizer and poison, and credited one-third of the remaining proceeds from the sale of the cotton and seed to the account of Black Ankle Plantation. The residue of two-thirds was credited to the account of the tenant for sup-

plies furnished, or was paid to him in cash, if he was not in arrears on account of supplies. Hence the liens for ginning, rent and supplies were thereby simultaneously extinguished. The landlord had no funds with which to pay for ginning, or to purchase the cotton and seed and to pay for the advanced supplies or the cash to the tenant, in case he was indebted on that account. There was no proof of fraud or bad faith on the part of Banks and Company. On the contrary, the proof was undisputed that the cost of ginning and the prices for cotton and seed were the prevailing prices at that time in the Town of Hernando. In 1952, Banks and Company lacked $3,-896.17 of realizing what it paid the tenants for cotton and seed that year.

After a sale by the tenant, if Banks and Company thereafter was able to make a profit on the cotton and seed, such profit inured to its benefit; and it cannot be required to make a division thereof with others. The accounting of Banks and Company for rent, namely, one-third of the proceeds of the sale of cotton and seed to it by the tenants, after deducting the cost of fertilizer, poison and ginning, was based on the proper formula, and the trial court was in error in rejecting it. Hence the decree, in that respect, is reversed.

██ █ Now "the general rule is that a tenant in common is entitled to contribution for expenditures made for repairs which were necessary, when he acted in good faith and there was a substantial benefit to the premises * * * ." 86 C. J. S. 449, Tenancy in Common, Section 68, b. Repairs. See also 14 Am. Jur. 114, Section 48; and Connolly v. McLeod, 217 Miss. 231, 63 So. 2d 845.

██ █ But the ditch here in question was constructed because, after the Arkabutla Dam was built, water backed up and closed the old Cow Pen Ditch. The Federal Government contributed $5,011.12 under the PMA Program. The expenditures were not incurred in cleaning out and repairing an existing ditch; but they were

used for a new construction, which was permanent in character. The generally accepted rule is that "a cotenant who, on his own motion without the consent or agreement of his cotenants, places improvements on the common property cannot compel his cotenants to contribute to his expenditures therefor, and cannot maintain an action at law for contribution against them." 86 C. J. S. 450-451, Tenancy in Common, Section 68, c. Improvements. See also 14 Am. Jur. 115-116, Cotenancy, Section 49. Delta Cotton Oil Company v. Lovelace, 189 Miss. 113, 196 So. 644, is not in point here for the appellants because the improvement, in that instance, was made with the cotenant's acquiescence.

Consequently the court below was correct in disallowing credit for the ditch, and in that respect, the decree is affirmed.

Insofar as the expense of supervision is concerned, it was doubtless reasoned that these charges for care and management would, and did, result in higher rents for the owners. Perhaps this is true. But in 86 C. J. S. 457-458, Tenancy in Common, Section 68, g. Compensation for Services, it is said: "As a general rule, one tenant in common cannot charge his cotenants for services rendered in the care and management of the common property, in the absence of an agreement for compensation, except where a statute provides otherwise or an order of court intrusting the management of the property to one cotenant authorizes compensation." See also 14 Am. Jur. 98, Cotenancy, Section 30; and Lake v. Perry, 99 Miss. 347, 54 So. 945.

The renting to the tenants seems to have been unconditional. There was no proof that the landlord, as such, reserved any right of supervision. Obviously it was to the interest of Banks and Company, in furnishing supplies, to have an understanding with the tenants that it could, and would, maintain supervision in raising the crop in order to protect itself against loss. But that kind of expense, in the absence of an agree-

ment, was not properly chargeable against the cotenants. The trial court properly disallowed such cost of supervision except in the following instances: for 1943 and 1944, the appellees accepted and cashed the checks of Banks and Company, which recited that they were in full payment, for those years, of the appellees' interest in the net profits from the plantation. ■■ While payment was not expressly pled, the checks were introduced in evidence without objection. Hence the insufficiency of the pleading was therefore waived. 1 C. J. S. 551, 552, Accord and Satisfaction, Section 47. Appellees are therefore bound, in this particular, for those two years by the acceptance of the checks. State Highway Department v. Duckworth, et ux, 178 Miss. 35, 172 So. 148. As to this feature, the decree is affirmed in part and reversed in part, as above indicated.

■■ Mrs. Banks did not charge interest on advances for repairs and building supplies regardless of how long she was without her money. There was no proof of wrongdoing. The claim for the expenses of the ditch and for supervision would not evince a breach of any trust relationship. The mother of the appellees seems to have registered no objection to the manner of the operations during her lifetime. The appellees manifested real concern about the operations only after the construction of the ditch. Schwander v. Rubel (Miss.), 75 So. 2d 45, deals fully with this kind of situation. Under the circumstances, interest should be allowed only from and after the date of the final decree, which determines the true amount then due. Consequently, that part of the decree relative to interest is reversed.

The cause is therefore remanded for final determination in accordance with the views hereinabove set forth. Costs in this Court are to be divided equally between the parties.

Affirmed in part: and in part reversed and remanded with directions.

*McGehee, C. J.*, and *Arrington, Ethridge* and *Gillespie, JJ.*, concur.