# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2012-CA-02010-SCT

*BRONWYN BENOIST PARKER*

*v.*

*WILLIAM DEAN BENOIST*

*AND*

*WILLIAM D. BENOIST, INDIVIDUALLY, AND IN HIS CAPACITY OF EXECUTOR OF THE ESTATE OF BILLY DEAN "B.D." BENOIST, DECEASED*

*v.*

*BRONWYN BENOIST PARKER*

## ON MOTION FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 02/20/2012 |
| TRIAL JUDGE: | HON. PERCY L. LYNCHARD, JR. |
| TRIAL COURT ATTORNEYS: | GOODLOE TANKERSLEY LEWIS |
| | AMANDA POVALL TAILYOUR |
| | GRADY F. TOLLISON, JR. |
| | REBECCA B. COWAN |
| | KRISTEN E. BOYDEN |
| COURT FROM WHICH APPEALED: | YALOBUSHA COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | GOODLOE TANKERSLEY LEWIS |
| | AMANDA POVALL TAILYOUR |
| ATTORNEYS FOR APPELLEE: | GRADY F. TOLLISON, JR. |
| | TAYLOR H. WEBB |
| | REBECCA B. COWAN |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |

| DISPOSITION: | ON DIRECT APPEAL: AFFIRMED IN PART; REVERSED AND RENDERED IN PART; REVERSED AND REMANDED IN PART |
| | ON CROSS-APPEAL: AFFIRMED - 02/19/2015 |
| MOTION FOR REHEARING FILED: | 09/25/2014 |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., KITCHENS AND CHANDLER, JJ.**

**KITCHENS, JUSTICE, FOR THE COURT:**

¶1.     Bronwyn Benoist Parker's motion for rehearing is granted. The original opinion is withdrawn and this opinion is substituted therefor.

¶2.     Parker and William Benoist are siblings who litigated the will of their father, Billy Dean "B.D." Benoist, in the Chancery Court of Yalobusha County. In 2010, B.D. executed a will which significantly altered the distributions provided by a previous will that B.D. had executed in 1998. Bronwyn alleged that William had unduly influenced their father, who was suffering from dementia and drug addiction, into making the new will, which included a forfeiture clause that revoked benefits to any named beneficiary who contested the will. Bronwyn lost the will contest and her benefits under the new will were revoked by the trial court. In this appeal, we must determine whether Mississippi law should recognize a good-faith and probable-cause exception to a forfeiture *in terrorem* clause in a will. We hold that it should, and that Bronwyn has sufficiently shown that her suit was brought in good faith and was founded upon probable cause. Accordingly, we reverse the decision of the chancery court that excluded Bronwyn from the will, and we render judgment in her favor to allow her to inherit in accordance with her father's 2010 will. We affirm the chancellor's decisions to

2

permit William to pay attorneys with funds obtained from his father's estate and to deny attorney fees to the estate. Because the chancellor applied the wrong legal standard, we reverse the chancellor's decision to allow William to continue as executor and remand for a determination of whether a temporary executor should be appointed.

## FACTS AND PROCEDURAL HISTORY

¶3.     In 1998, B.D. Benoist entered into mutual reciprocal wills with his wife Mary Benoist ("the 1998 will"). The reciprocal wills provided that, in the event of either spouse's death, a credit shelter trust would be established to support the surviving spouse, with their children, Bronwyn and William, as the trustees. After the death of the surviving spouse, the two residual beneficiaries were to inherit equal shares of both the trust and the surviving spouse's estate. Mary died soon after executing her will, and the Mary G. Benoist Trust was set up to support B.D. As cotrustees, Bronwyn and William were to manage the credit shelter trust during B.D.'s lifetime, "pay all of the net income of the trust estate to or for the benefit of [B.D.]," and pay out of the principal of the trust any amounts that they deemed necessary for B.D.'s support, health, and maintenance. According to Bronwyn, at its highest valuation in December 1998, the balance of the trust was $462,308. Starting in 2008, B.D. began withdrawing large sums of money from the trust totaling $244,310.03. On May 31, 2011, after B.D. had died, the trust account had a balance of $84,973.24.

¶4.     In 2008, B.D.'s mind and memory began to deteriorate. William testified that it was due to his drinking and characterized his father's condition as "slight dementia." William testified that his father's mind suffered when he drank heavily, but would snap right back during periods of lucidity. During that time, B.D. also was taking Lortab for back pain.

3

According to William, B.D. would take "a couple [of Lortabs] in the morning, a couple at night, and that pain medicine messed [his] mind up." William himself had been on disability since 2000 for cluster headaches, for which he took methadone. As a result of his condition, he generally stayed around the house and didn't do much. William either talked to or visited B.D. every day after Mary died. In 2009, William's wife filed for divorce. The divorce was very difficult for William financially, and B.D. supplied him substantial assistance.

¶5.    In 2009, B.D. began seeing Dr. Cooper McIntosh, an internist in Oxford, Mississippi. He complained of falling and dizziness. The doctor listed the numerous drugs that B.D. was taking, and stated in a report that B.D. had "significant dementia." B.D. went to Dr. McIntosh several times that year, at times appearing confused. At one point, William called on B.D.'s behalf requesting Lortab, but when B.D. was examined, he did not appear to be in pain. At trial, Dr. McIntosh testified that he "never saw [B.D.] where I would say he was incompetent over, what, almost two years, a year and a half." In June of 2009, B.D. was diagnosed with mild dementia at a V.A. hospital in Jackson.[1] Eventually, Bronwyn became so concerned about her father's increased drinking, depression, and dementia that she wanted to get power of attorney over him. Bronwyn also became concerned about significant withdrawals that were made from B.D.'s trust account and his private Merrill Lynch account, which were sent

---

[1]Several other allegations were made concerning B.D.'s mental state. B.D. was rumored to have sexually harassed two women. B.D. and Bronwyn's husband, Walt, had enjoyed a good relationship until, according to Bronwyn, B.D. became distrustful and unfriendly toward him. Also, B.D.'s golfing buddies testified that he would show up for golf, and then just wander off without playing.

directly to William. Near the end of his life, B.D. also conveyed a large portion of his real estate to William.

¶6.    In 2010, B.D. executed a new will ("the 2010 will"). When B.D. died less than a year later, William submitted the 2010 will for probate. Bronwyn, until that point unaware of the new will, entered the 1998 will for probate. She also filed a complaint requesting that the court remove William as a cotrustee of the Mary G. Benoist Trust and order him to make a full and accurate accounting of the trust, void any benefits William had received due to his undue influence upon B.D., and grant any legal and equitable relief to Bronwyn to which she was entitled.[2] Over Bronwyn's objection, the chancery court permitted William, as executor of B.D.'s estate under the 2010 will, to take assets worth $20,000 from the estate to pay a retainer fee to the Tollison law firm to defend against some of Bronwyn's claims. This was done despite Bronwyn's removing B.D.'s estate as a party from the action against the Mary G. Benoist Trust. The chancery court also declined to remove William as the executor of the estate and appoint a temporary executor.

¶7.    The matters were consolidated, and a jury trial ensued in the Chancery Court of Yalobusha County. Bronwyn argued that William had exerted undue influence over B.D. by convincing B.D. to give several *inter vivos* gifts of thousands of dollars and real estate to William. Bronwyn contended that these gifts drastically reduced her father's estate, unfairly affecting her inheritance. She argued that the terms of the 2010 will, combined with the substantial *inter vivos* gifts from B.D. to William, robbed her of much of what she should have inherited under the 1998 will. She also alleged that William was behind the drafting and

_____

[2]The trust action is not at issue in this appeal.

5

execution of B.D.'s 2010 will. She contended that William had hidden a document which granted both William and Bronwyn B.D.'s power of attorney, and instead turned B.D. against Bronwyn's husband Walt by convincing him that Walt wanted to use some of B.D.'s property for a commercial development. William argued that Walt and Bronwyn were collaborating against B.D., and that they were going to use Bronwyn's inheritance under the 1998 will in a way which was contrary to B.D.'s wishes. He stated that his father's gifts to him all were aboveboard and simply were the gifts a loving father would give to a son who was having a tough time. Several witnesses were called, including Dr. McIntosh, to testify about B.D.'s mental state and his late-in-life alcoholism and prescription drug problems. Other relevant facts will be included in this opinion as necessary.

¶8.    After a trial in the Chancery Court of Yalobusha County, the jury found that the 2010 will was valid and enforceable.[3] The jury unanimously found that there existed a confidential relationship between William and B.D., but it did not find that William had exerted undue influence over B.D. Further, the 2010 will included a forfeiture provision which stated that any beneficiary of the will who instigated a will contest, "regardless of whether or not such proceedings [we]re instituted in good faith and with probable cause," would have his or her benefits under the will revoked. The chancellor found the provision enforceable and held that Bronwyn was no longer a beneficiary of the will. However, he held that the part of the provision which mandated that unsuccessful challengers must pay attorney fees was

---

[3]Bronwyn does not ask the Court to overrule the jury's determination of the validity of the 2010 will.

6

unenforceable, as it permitted the testator to dispose of property that was not his. Bronwyn

appealed, raising the following issues:

1. The lower court erred when it failed to recognize a good faith and probable cause exception as adopted by most jurisdictions, the Uniform Probate Code, and the Restatement to the forfeiture clause in the 2010 will.

2. The lower court erred in ruling that Benoist, as Executor of the Estate, pay a retainer of $20,000 to the Tollison Law Firm when Benoist and Parker–the only parties in interest–were voluntarily before the court and had joined issue before the court as to the probate of the 2010 will.

3. The lower court erred in failing to remove Benoist as the Executor of the Estate and appoint a temporary administrator during the pendency of the will contest.

William cross-appealed, arguing that the chancellor had erred in not enforcing the attorney

fee provision in B.D.'s will.

## **ANALYSIS**[4]

### *I.*     *Whether the law of Mississippi should recognize a good faith and probable cause exception to forfeiture provisions in wills.*

¶9. The forfeiture clause in the 2010 will stated:

If any beneficiary hereunder (including, but not limited to, any beneficiary of a trust created herein) shall contest the probate or validity of this Will or any provision thereof, or shall institute or join in (except as a party defendant) any proceeding to contest the validity of this Will or to prevent any provision thereof from being carried out in accordance with its terms (*regardless of whether or not such proceedings are instituted in good faith and with probable cause*), then all benefits provided for such beneficiary are revoked and such benefits shall pass to the residuary beneficiaries of this Will. . . .

(Emphasis added.)

---

[4]We review questions of law *de novo* and questions of fact under an abuse-of-discretion standard. ***Matter of Estate of Mason***, 616 So. 2d 322, 327 (Miss. 1993) (internal citations omitted).

7

¶10. A hearing was held on the applicability of the forfeiture clause. By order, the chancellor held that the forfeiture clause was enforceable, "as testators enjoy the right to do as they wish, subject to existing laws." Because Mississippi law did not prohibit such a clause, "the clause contained in B.D. Benoist's Will is valid and enforceable." Under the terms of the clause, Bronwyn was denied any benefits under the will and ordered to pay all attorney fees and court costs associated with the will contest.[5] The chancellor never determined whether Bronwyn's suit was brought in good faith. Because she lost, the forfeiture provision automatically cut her out of the will. We hold that such a provision is unconstitutional under Mississippi's Constitution, void as against public policy, and fundamentally inequitable, and we join the large number of jurisdictions which permit a good-faith and probable-cause exception to forfeiture clauses in wills.

¶11. While this may be a case of first impression in Mississippi, this issue has been confronted by courts for hundreds of years, and most of them have held that forfeiture clauses in wills are unenforceable when a will contest is brought in good faith and based upon probable cause. "The origins of this exception are found in the 1688 English case of *Powell v. Morgan*[, 2 Vern. 90, 23 Eng. Rep. 668 (Ch. 1688)], where, without explanation, the court simply stated that the contestant had 'probabilis causa litigandi,'[6] and that consequently no forfeiture would result." Gerry W. Beyer, Rob G. Dickinson, Kenneth L. Wake, *The Fine Art of Intimidating Disgruntled Beneficiaries with In Terrorem Clauses*, 51

---

[5]The chancery court initially held that Bronwyn was required to pay attorney fees for initiating the will contest pursuant to the terms of the will. Upon granting Bronwyn's motion to reconsider, the chancellor held that B.D.'s will could not obligate her to pay attorney fees.

[6]This means, literally, "probable cause for competition."

8

SMU L. Rev. 225, 247 (1998). The logic for a good-faith exception is simple: courts exist

to determine the truth. A forfeiture clause that operates regardless of a party's good faith in

bringing suit to ascertain the validity of a will frustrates the fundamental purpose of a court,

which is to determine whether a will is valid or not. This was recognized by the Supreme

Court of Connecticut, whose opinion is worth quoting at length. The court stated:

> Courts cannot know whether a will, good on its face, was made in conformity to statutory requirements, whether the testator was of sound mind, and whether the will was the product of undue influence, unless these matters are presented in court. And those only who have an interest in the will will have the disposition to lay the facts before the court. If they are forced to remain silent, upon penalty of forfeiture of a legacy or devise given them by the will, the court will be prevented by the command of the testator from ascertaining the truth, and the devolution of property will be had in a manner against both statutory and common law. Courts exist to ascertain the truth and to apply it to a given situation, and a right of devolution which enables a testator to shut the door of truth and prevent the observance of the law is a mistaken public policy. If, on contest, the will should have been held invalid, the literal interpretation of the forfeiture provision has suppressed the truth and impeded the true course of justice. If the will should be held valid, no harm has been done through the contest, except the delay and the attendant expense.

*South Norwalk Trust Co. v. St. John*, 92 Conn. 168, 101 A. 961, 963 (1917). That court

concluded that a legatee who brings a contest in good faith and upon probable cause should

not forfeit his legacy, as "[h]e has been engaged in helping the court to ascertain whether the

instrument purporting to be the will of the testator is such." *Id.*[7]

---

[7]Several other courts have come to the same conclusion. *See* ***Matter of Seymour's Estate***, 600 P.2d 274, 278 (N.M. 1979) ("[N]o-contest provisions are valid and enforceable in New Mexico, but they are not effective to disinherit a beneficiary who has contested a will in good faith and with probable cause to believe that the will was invalid."); ***In re Foster's Estate***, 376 P.2d 784, 786 (Kan. 1962) ("[A] bona fide belief in the invalidity of the will and with probable cause prevents the application of an *in terrorem* clause as to a beneficiary under the will."); ***Hartz's Estate v. Cade***, 77 N.W.2d 169, 171 (Minn. 1956) (holding that the existence of a good-faith and probable-cause exception is "more in conformity with the

¶12.    The Restatement (Third) of Property supports the position that a probable-cause exception should be made to forfeiture provisions in will contests. *Restatement (Third) of Property: Wills and Donative Transfers* § 8.5 (2003). "A provision in a donative document purporting to rescind a donative transfer to, or a fiduciary appointment of, any person who institutes a proceeding challenging the validity of all or part of the donative document is enforceable unless probable cause existed for instituting the proceeding." *Id.* The Restatement does acknowledge that forfeiture clauses may serve a valuable purpose in deterring "unwarranted challenges to the donor's intent by a disappointed person seeking to gain unjustified enrichment," or preventing "costly litigation that would deplete the estate or besmirch the reputation of the donor," or discouraging "a contest directed toward coercing

---

interests of justice and the dictates of public policy"); *Ryan v. Wachovia Bank & Trust Co.*, 70 S.E.2d 853, 856 (N.C. 1952) ("[A] bona fide inquiry whether a will was procured through fraud or undue influence, should not be stifled by any prohibition contained in the instrument itself."); *In re Estate of Cocklin*, 17 N.W.2d 129, 135 (Iowa 1950) (recognizing that a good-faith and probable-cause exception to forfeiture clauses was "in the interest of good public policy"); *Dutterer v. Logan*, 137 S.E. 1, 3 (W. Va. 1927) ("We think there can be no doubt that the great weight of authority is against the strict enforcement of forfeitures contained in devises and bequests. On the contrary, that when there is *probabilis causa litigandi*, such forfeitures will not be enforced . . . ."); *In re Chappell's Estate*, 221 P. 336, 338 (Wash. 1923) ("[I]t not being denied that the contest was made in good faith, . . . we are further convinced that appellant had probable cause for instituting the proceedings he did, and that by so doing he did not forfeit his legacy."); *Tate v. Camp*, 245 S.W. 839, 842 (Tenn. 1922) (holding that the reasoning of the cases which found that a good-faith and probable-cause exception should apply to will contests announced "a more equitable and just rule . . . ."); *Rouse v. Branch*, 74 S.E. 133, 135 (S.C. 1912) ("The right of a contestant to institute judicial proceedings upon probable cause to ascertain whether the will was ever executed by the apparent testator is founded upon justice and morality."); *In re Friend's Estate*, 58 A. 853, 854 (Pa. 1904) ("The better rule, however, seems to us to be that the penalty of forfeiture of the gift or devise ought not to be imposed when it clearly appears that the contest to have the will set aside was justified under the circumstances, and was not the mere vexatious act of a disappointed child or next of kin."). The Uniform Probate Code also has adopted a good-faith and probable-cause exception. *See* Unif. Probate Code § 3-905 (1982).

10

a settlement–the so-called strike suit." *Id.,* cmt. b. However, enforcing such a provision without a probable-cause exception would defeat "the jurisdiction of the court to determine the validity of a donative transfer." *Id.* Essentially, the Restatement reasons that unlimited enforceability of forfeiture clauses frustrates the fundamental purpose of the courts to ascertain the truth.[8]

¶13.    Additionally, permitting a good-faith and probable-cause exception to challenges to wills containing forfeiture provisions is firmly in line with the maxims of equity. Will contests take place in chancery court. "A party seeking equity must show that in good faith he has done equity. . . . [N]othing but conscience, *good faith*, and reasonable diligence can call forth the activities of a court of equity. . . ." V. A. Griffith, *Miss. Chancery Practice* § 32 (2000). Suits in equity already must be brought in good faith. Allowing a good-faith and probable-cause exception would impose no higher burden on chancery courts to ascertain the truth and intentions of the parties. Additionally, "[t]o protect and enforce property rights is the object of equity. . . ." *Id.* at § 34. For a court of equity to protect and enforce property rights, it must be able to hear disputes regarding those rights. Without a good-faith exception to forfeiture clauses, the testator's will would frustrate the very object of equity. This cannot be allowed.

---

[8]The Restatement also offers a good definition of probable cause in such a context. "Probable cause exists when, at the time of instituting the proceeding, there was evidence that would lead a reasonable person, properly informed and advised, to conclude that there was a substantial likelihood that the challenge would be successful." *Restatement (Third) of Property: Wills and Other Donative Transfers* § 8.5 cmt. c (2003).

¶14. All the above notwithstanding, the most compelling reason to allow a good-faith exception lies in Mississippi's Constitution. The right of access to the courts is fundamental in this State. "All courts shall be open; and every person for an injury done him in his lands, goods, person, or reputation, shall have remedy by due course of law, and right and justice shall be administered without sale, denial, or delay." Miss. Const. art. 3, § 24. To allow the enforcement of a forfeiture clause, regardless of a good-faith challenge based upon probable cause, would be unconstitutional and against public policy. A forfeiture provision that acts regardless of a will contestant's good faith would frustrate the right of that citizen to access the courts and have a court determine whether he was injured and whether he is entitled to a remedy. A testator cannot be allowed to hamper so fundamentally such a vital right to his heirs. The Supreme Court of Wisconsin recognized as much in that state's counterpart to Section 24 of the Mississippi Constitution.[9] It stated that such a section is "a basic and valuable guaranty that the courts of the state should be open to all persons who in good faith and upon probable cause believe they have suffered wrongs." *In re Keenan's Will*, 205 N.W. 1001, 1006 (Wis. 1925).[10] A good-faith and probable-cause exception to the enforceability

---

[9]Wis. Const. art. I, § 9 ("Every person is entitled to a certain remedy in the laws for all injuries, or wrongs which he may receive in his person, property, or character . . . ."), *preemption recognized by Koscielak v. Stockbridge-Munsee Community*, 811 N.W.2d 451, 457-58 (Wis. Ct. App. 2012) (holding that the provision was preempted by federal law when applied against Native American tribes who enjoyed absolute immunity as a foreign sovereign).

[10]"Is it not against public policy to permit one person to deprive another from asserting his rights in court? And especially so before it is ascertained that the prohibition against contest is in fact that of the testator and not that of one exercising undue influence over him, or that he was mentally competent to make it?" *In re Keenan's Will*, 205 N.W. 1001, 1006 (Wis. 1925).

of forfeiture clauses in wills is in keeping with the guaranty of all citizens of this state to seek redress for their grievances through due process of law.

¶15.    The weight of authority, logic, and fairness is firmly on the side of a probable-cause and good-faith exception. The courts of this state are charged with ascertaining the truth. Chancery courts are charged with protecting property rights. The Constitution of Mississippi recognizes the fundamental right of an aggrieved citizen of this state to have access to courts to receive compensation for any injury done to him or her. The will of the testator should control, but courts exist to determine whether the testator's will is a valid reflection of the testator's wishes. Black's Law Dictionary defines "probate" as a "[c]ourt procedure by which a will is proved to be valid or invalid. . . ." *Black's Law Dictionary* 1081 (5th ed. 1979). By definition, probating a will is *proving* that it is valid. This must occur through litigation. A strict interpretation of no-contest provisions in wills would hamper courts' goal of determining what is, once and for all, the will of the testator. A *bona fide* inquiry into the validity of the will should not be defeated by language contained in the will itself. We hold that, in Mississippi, forfeiture provisions in wills are enforceable unless a contest is brought in good faith and based on probable cause. "Probable cause exists when, at the time of instituting the proceeding, there was evidence that would lead a reasonable person, properly informed and advised, to conclude that there was a substantial likelihood that the challenge would be successful." *Restatement (Third) of Property: Wills and Other Donative Transfers* at § 8.5 cmt. c. The determination of good faith and probable cause should be inferred from the totality of the circumstances.

13

### II. Whether Bronwyn Parker's challenge to the 2010 will was made in good faith and founded upon probable cause.

¶16. We find that there is sufficient evidence before us to determine whether Bronwyn's challenge to the 2010 will was undertaken in good faith and founded upon probable cause.

### A. Estoppel

¶17. William initially argues that Bronwyn should be estopped from arguing that the forfeiture clause is unenforceable because her attorney asked the jury to consider the forfeiture clause during its deliberations. He argues that a party may not take "a position which is inconsistent with the one previously assumed in the course of the same action or proceeding." *Grand Casino Tunica v. Shindler*, 772 So. 2d 1036, 1039 (Miss. 2000) (quoting *Miss. State Highway Comm'n v. West*, 181 Miss. 206, 179 So. 279, 283 (1938)). William argues that, by asking the jury to consider the clause, Bronwyn "fully conceded its legitimacy and enforceability . . . ."

¶18. This argument is without merit. As the trial court found at the time, the entire will had been admitted as an exhibit, and therefore the entire contents of the will were before the jury to consider. Simply pointing the jury to a clause of the will did not amount to concession of its validity. On the contrary, Bronwyn's entire suit was based on the invalidity of the will as a whole. Bronwyn is not estopped from arguing that the forfeiture provision is unenforceable.

### B. Good faith and probable cause

¶19. Bronwyn contends that her contest was based on good faith and probable cause and bases much of her argument on a case from Tennessee which addressed a situation nearly identical to the one before us. In *Winningham v. Winningham*, 966 S.W.2d 48, 49 (Tenn.

14

1998), a father/testator had executed a new will shortly before his death which granted significantly more property to his son than had been granted in previously executed, mutually reciprocal wills made by the father and his wife. The new will contained a forfeiture clause which specifically attempted to eliminate a good-faith challenge to the will by denying benefits to any challengers. *Id.* The Tennessee Supreme Court applied Tennessee's good-faith and probable-cause exception, holding that, in Tennessee:

> a testator cannot eliminate the good faith and reasonable justification exception *even by specific language.* As stated in **Tate v. Camp**, "Courts exist to ascertain the truth and to apply the law to it in any given situation; and a right of devolution which enables a testator to shut the door of truth and prevent the observance of the law, is a mistaken public policy." [**Tate**, 245 S.W. at 842].

**Winningham**, 966 S.W.2d at 52 (emphasis added). The court moved on to determine whether the plaintiff's contest had been made in good faith.

> In the case before the Court, the record supports the trial court's finding that the suit was filed by Ms. Winningham in good faith. The previous will had divided the property equally between the plaintiff and the defendant. The defendant testified that she believed that her father lacked mental capacity at the time he wrote the later will. The 1992 will, which decreases her share in the estate, was written just months before the testator's death from cancer and while he was receiving debilitating medical treatment. . . . The plaintiff presented no evidence of bad faith. Filing the suit was not "a mere vexatious act" but was based on honest conviction.

*Id.*

¶20.    The court then went on to determine whether the plaintiff's suit was founded on probable cause. The court found that, "on balance, there was reasonable justification for Ms. Winningham's decision to file the suit, the purpose of which was to establish the testator's 1981 will as his last will and testament." *Id.* at 53. Many of the factors which supported a finding of good faith also supported a finding of probable cause. *Id.* The plaintiff felt she was

15

entitled to the inheritance that was drawn out in the earlier will and reasonably could have believed that her father's mental state had become so impaired that he was incompetent to make the new will. ***Id.***

¶21.	William argues that ***Winningham*** is distinguishable from this case and should not be considered as support for Bronwyn's position. ***Winningham*** was decided in a state where a good-faith and probable-cause exception already existed, whereas here, no Mississippi authority can be found on the subject. Further, the plaintiff in ***Winningham*** relied on advice from her attorney that her contest would be successful. ***Winningham***, 966 S.W.2d at 53. William argues that, because Bronwyn was presented with evidence supporting William's claim before she continued the contest, her contest could not have been made in good faith.

¶22.	Bronwyn's claim was based upon the fact that she understood her parents' intentions in the mutual reciprocal wills from 1998 to be that she and her brother "share and share alike." It cannot be disputed that those were the wishes of her mother, Mary, who died shortly after her will was executed. Mary's will explicitly stated that her children were to inherit equally the remainder of her trust upon the death of B.D. Mary's and B.D.'s 1998 wills provided that the estate of the latter-deceased parent would be given to William and Bronwyn, "in equal shares, per stirpes." At least until 2010, Bronwyn was under the impression that the estate would be divided according to the 1998 will. Further, she testified about B.D.'s failing mental and physical health toward the end of his life, and even William testified about B.D.'s alcoholism and use of strong prescription pain killers. Bronwyn knew that Dr. McIntosh had prescribed two drugs used to treat "cognition problems." Dr.

16

McIntosh's records state that, when he prescribed those drugs for B.D., B.D. was suffering from "significant dementia."

¶23.   Further, large withdrawals were made from B.D.'s trust account and his private Merrill Lynch account, which were sent directly to William. B.D. also conveyed a large portion of his real estate to William around the time the 2010 will was executed. Bronwyn understandably was worried about these *inter vivos* gifts. The gifts severely depleted B.D.'s estate, rendering much smaller the amount of property that Bronwyn and William would have shared and shared alike under the 1998 will.  Overall, Bronwyn argues that her father's failing mental state, his erratic behavior, and his dependence on alcohol and pain killers made him vulnerable to the suggestions of William, an unemployed man experiencing a difficult divorce who convinced B.D. to give him large sums of money beyond what he would have received under the provisions of his father's 1998 will. Several similar circumstances justified a finding of good faith and probable cause by the Tennessee Supreme Court in *Winningham*.

¶24.   We find that Bronwyn's will contest was brought in good faith and was founded on probable cause. As noted by the Tennessee Supreme Court in *Winningham*, many of the factors which support a finding of good faith support a finding of probable cause, and *vice versa*. Based on the totality of the circumstances, Bronwyn had a reasonable expectation that her will contest would be successful and has provided significant evidence that she instituted the contest in good faith. B.D. greatly depleted his estate, to William's benefit, by giving several *inter vivos* gifts of money and real property to William before B.D. expired. Under the 1998 will, Bronwyn and William would have split the estate equally. Although the 2010

17

will may not have significantly altered the distribution of B.D.'s assets in terms of monetary value, it nevertheless did change the disposition of those assets when considered in combination with the *inter vivos* gifts from B.D. to William, which Bronwyn sought to void. William clearly benefitted from those gifts, as he ultimately wound up with property that he would not have received under the 1998 will. Bronwyn would, understandably, have been concerned by her father's actions. The claim was not frivolous or made to cause vexatious litigation. The evidence presented by Bronwyn "would lead a reasonable person, properly informed and advised, to conclude that there was a substantial likelihood that the challenge would be successful." *Restatement (Third) of Property: Wills and Other Donative Transfers* at § 8.5 cmt. c. No evidence was adduced that showed bad faith on Bronwyn's part. Based upon the totality of the circumstances, Bronwyn satisfied her burden of proof to demonstrate that her will contest was brought in good faith and was founded upon probable cause. Accordingly, we reverse the judgment of the chancery court and render judgment in favor of Bronwyn on the forfeiture clause issue. The 2010 will is valid except for the forfeiture clause, and Bronwyn cannot be cut out of the will for bringing her good-faith suit to determine its validity.

> ### III.    *Whether the trial court properly permitted William, as executor of B.D.'s estate, to pay $20,000 to the Tollison Law Firm out of the estate assets.*

¶25.    On December 9, 2011, William, in his capacity as the executor of B.D.'s estate, filed a Petition for Authority to Liquidate Estate Assets and Pay Estate Liabilities. He requested $14,968.76 to pay the law firm of Stubblefield & Yelverton, $1,387.17 to pay an accounting firm, and $20,000 to pay a retainer to the Tollison Law Firm to represent the estate in the will

18

contest. Bronwyn had no objection to the payments to Stubblefield & Yelverton or to the accounting firm. However, Bronwyn did object to the retainer to Tollison. She argued that William was in an adverse position to the Estate under the 1998 will, and that his position in the will contest was only as an individual, and not as the executor of B.D.'s estate. The chancellor granted William's petition to liquidate assets and retain the Tollison firm. Bronwyn argues that the chancellor erred, because William was acting in his individual capacity and because he stood adverse to the estate of the 1998 will.

¶26.    "[W]here one will has been admitted to probate in common form under the laws of this State as the last will of a deceased testator, it will remain the last will of the testator unless (within the time allowed by law) it is set aside by an order of the chancery court upon a contest and issue devisavit vel non . . . ." *Perry v. Aldrich*, 251 Miss. 429, 441, 169 So. 2d 786, 791 (1964). William argues that the 2010 will was admitted to probate as the last will of B.D., and, as such, it remained the last will of B.D. unless and until Bronwyn's will contest was successful. Accordingly, Bronwyn's will contest was a direct challenge to the estate of B.D. established by the 2010 will, of which William was the executor. "Every executor of a will and administrator with the will annexed must swear that he or she will execute the will *according to the wishes of the testator*." Jeffrey Jackson, *Encyclopedia of Miss. Law* § 33:57 (2001) (emphasis added). As the executor, William had the authority under the will to "employ . . . attorneys . . . and . . . to pay reasonable compensation for their services and to charge same to. . . ." To ensure that the wishes of B.D. as written in his 2010 will were followed, William was acting in his capacity of the executor of the estate when he paid the Tollison Law Firm to represent him–the executor–in the will contest. To hold that

19

this was inappropriate would discourage executors who also are beneficiaries from defending wills because they would have to pay lawyers out of their own pockets. We hold that the chancellor did not err in permitting William to use part of the assets of the estate to defend the will contest. Bronwyn's claim in this regard is without merit.

**IV.** **Whether the trial court erred in failing to remove William as the Executor of B.D.'s estate and appoint a temporary administrator during the pendency of the will contest.**

¶27. Bronwyn filed an Amended Petition to Remove William D. Benoist as Executor, arguing that he had substantially drained B.D.'s estate both before and after B.D.'s death through a pattern of undue influence over B.D., whose mind was failing toward the end of his life. She listed several *inter vivos* gifts from B.D. to William, which included substantial amounts of real property and cash which originally would have been part of the estate split evenly between William and Bronwyn under the 1998 will.[11] As the executor, William is in charge of determining what property of the estate will be sold to pay the estate's debts. Further, as a large amount of B.D.'s assets was given to William via *inter vivos* gift before B.D.'s death, most of the remaining assets of the estate rightfully would go to Bronwyn under the 2010 will. She fears that William will pay off the estate's debts with whatever remains of her property in B.D.'s estate. Bronwyn argued to the chancery court that her will contest, combined with William's depletion of estate assets which properly would have gone to Bronwyn under the 1998 will, rendered William adverse to the estate, and that a neutral

---

[11]These include money spent for William's own benefit, including $11,640 to a divorce attorney to handle William's divorce, $139,109.29 to William personally, money for dental work, and money to pay private school tuition for one of William's children.

20

executor should be appointed. She also requested that an inventory and accounting of the assets of the estate be made. After considering the arguments of the parties, the chancellor denied the petition, stating that there remained "factual issues" which were "strongly disputed between the parties." The chancellor held that "[t]here [wa]s no uncontested evidence for the Court to remove William D. Benoist as the Executor of the Last Will and Testament of Billy Dean 'B.D.' Benoist."

¶28.    "[W]henever a last will and testament shall be contested, the chancery court or chancellor in vacation, on petition of any interested person, may appoint a temporary administrator if it shall appear necessary for the protection of the rights of the parties . . . ." Miss. Code Ann. § 91-7-53 (Rev. 2013). Chancellors have wide discretion in appointing a new executor in a will contest, and this Court "should not reverse his action unless there is clear evidence of abuse of that discretion." *Sandifer v. Sandifer*, 237 Miss. 464, 469, 115 So. 2d 46, 48 (1959). On appeal, Bronwyn essentially reiterates the facts that she believes necessitated a finding by the chancellor that a new executor should be appointed–substantial gifts from B.D. to William before B.D.'s death and William's mismanagement and depletion of estate assets after B.D.'s death. She argues that, because the jury found that William was in a confidential relationship with B.D., there was a presumption of undue influence.

¶29.    We find that the chancellor erred as a matter of law in determining that William would remain the executor of the estate. The chancellor stated that there was no "uncontested evidence" that would justify removing William as the executor. It is not required that there be uncontested evidence to justify the removal of an executor. All that is required is that the chancellor determine, in his or her discretion, that it is necessary to remove the current

21

executor to protect the rights of the parties to the will contest. *See* Miss. Code Ann. § 91-7-53 (Rev. 2013). "Nowhere does the statute say that before he may appoint a temporary administrator he must find that the executor named in the will is disqualified or has been guilty of misconduct in office." *Sandifer*, 115 So. 2d at 47-48. While chancellors enjoy wide discretion in granting or denying requests to remove an executor, a party is not required to present "uncontested evidence" to succeed in such a petition.

¶30. Because the chancellor applied the wrong legal standard and incorrectly believed that only uncontested evidence was sufficient to remove William as the executor of his father's estate, we must reverse the chancellor's decision and remand for a determination of whether a temporary executor should be appointed. On remand, the chancellor must use the correct legal standard, with the understanding that it is within his discretion to remove William as the executor even though Bronwyn's evidence may be contested.

### V. CROSS APPEAL: Whether the trial court erred in denying attorney fees to B.D.'s estate and William as provided for in the 2010 will.

¶31. The forfeiture provision of B.D.'s will stated that if any beneficiary instituted a will contest, that beneficiary "shall pay all attorneys fees and court costs associated with the Will contest or related action." When the chancery court initially held that the forfeiture provision in B.D.'s will was enforceable, it also concluded that Bronwyn was required to pay attorney fees for initiating the will contest. Upon granting Bronwyn's motion to reconsider, the chancellor held that B.D.'s will could not obligate her to pay attorney fees. The chancellor reasoned that, although the "paramount duty of the court is to ascertain the intent of the testator," the court still may not give effect to such intent if it is "contrary to law or public

policy." The chancellor reasoned that, in requiring payment of attorney fees, the testator essentially was attempting to dictate the transfer of property that was not his and was beyond his control. The chancellor analyzed Mississippi Code Section 91-5-1,[12] which governs the authority of individuals to create wills, and concluded that it did not give persons power over property which was not theirs to begin with. We agree with this conclusion. Section 91-5-1 permits the testator to dispose of and "devise all the estate, right, title and interest in possession, reversion, or remainder, which he or she hath, or at the time of his or her death shall have . . . ." Miss. Code Ann. § 91-5-1 (Rev. 2013). The testator is not empowered to control assets that do not belong to him or her through a will, but may control only those things "which he or she hath, or at the time of his or her death shall have . . . ." *Id.* This clearly does not contemplate funds of a third party over which the testator had no control during his or her life or at his or her death. Mississippi does not statutorily authorize the payment of attorney fees by an unsuccessful will contestant. Accordingly, William can

---

[12]   Every person eighteen (18) years of age or older, being of sound and disposing mind, shall have power, by last will and testament, or codicil in writing, to devise all the estate, right, title and interest in possession, reversion, or remainder, which he or she hath, or at the time of his or her death shall have, of, in, or to lands, tenements, hereditaments, or annuities, or rents charged upon or issuing out of them, or goods and chattels, and personal estate of any description whatever, provided such last will and testament, or codicil, be signed by the testator or testatrix, or by some other person in his or her presence and by his or her express direction. Moreover, if not wholly written and subscribed by himself or herself, it shall be attested by two (2) or more credible witnesses in the presence of the testator or testatrix.

Miss. Code Ann. § 91-5-1 (Rev. 2013).

prevail in his claim only if there is an alternative avenue through which an award of attorney fees is appropriate.

¶32.    We review a chancellor's determination of whether to award attorney fees under an abuse-of-discretion standard. ***Schwander v. Rubel***, 221 Miss. 875, 897, 75 So. 2d 45, 54 (1954) (quoting ***King v. Wade***, 175 Miss. 72, 166 So. 327, 330 (1936)) (emphasis added). "[W]hen there is no contractual provision or statutory authority providing for attorney's fees, they may not be awarded as damages unless punitive damages are proper as well." ***Willard v. Paracelsus Health Care Corp.***, 681 So. 2d 539, 544 (Miss. 1996). There is no statutory authority for a testator to require the payment of attorney fees, and Bronwyn and William were not parties to a contract which included an attorney fees provision. Bronwyn has not been subject to punitive damages, nor is she in contempt of court. The chancellor did not abuse his discretion in denying attorney fees to William. The chancellor correctly noted that Mississippi does not statutorily authorize the payment of attorney fees by an unsuccessful will contestant. All that is permissible is for the will to detail the disbursement of the testator's property. The Legislature has not seen fit to grant testators the authority to invoke the power of the courts to compel unsuccessful contestants to pay attorney fees incurred in defending a will contest. As concluded by the chancellor, there are no means by which William can obtain attorney fees in these circumstances.

**CONCLUSION**

¶33.    We hold that forfeiture provisions in wills in Mississippi are enforceable unless the will contest has been founded upon probable cause and made in good faith. This is in accord with the majority of U.S. jurisdictions, the Restatement of Property, and the Uniform Probate

24

Code, and most faithfully conforms to our state constitutional guarantees of access to courts and the maxims of equity. Under the totality of the circumstances, Bronwyn Benoist Parker's will contest was based upon probable cause and was brought in good faith. Accordingly, the forfeiture provision in B.D.'s will is unenforceable against her. We reverse the decision of the Chancery Court of Yalobusha County in this regard, and render judgment in Parker's favor to the effect that she is entitled to her inheritance as provided in her father's 2010 will.

¶34. We further hold that the trial court did not abuse its discretion in permitting William Benoist to remove estate assets to pay attorneys to represent the estate during the will contest. However, the chancellor erred as a matter of law in refusing to remove William as executor of B.D. Benoist's estate under the 2010 will upon his finding that Bronwyn's evidence in support of William's removal was not uncontested. Upon remand, the chancellor must determine whether William shall remain the executor of the estate under the correct legal standard.

¶35. Finally, we hold that the chancery court was correct in determining that testators do not have the authority in Mississippi to require unsuccessful will contestants to pay attorney fees for their adversaries, as there is no statutory law permitting it. As the case did not involve any of the other situations in which attorney fees may be awarded, the chancery court correctly denied the payment of such attorney fees.

¶36. Accordingly, on direct appeal, we affirm in part and reverse in part, rendering judgment for Parker on the forfeiture issue and remanding the case for the trial court to determine whether William should remain executor of the estate, using the proper legal standard. We affirm the decision of the chancery court to allow William to pay attorneys to

25

represent the estate during the will contest. On cross-appeal, we affirm the chancery court's decision not to enforce the attorney fees provision in the will.

¶37.    **ON DIRECT APPEAL: AFFIRMED IN PART; REVERSED AND RENDERED IN PART; REVERSED AND REMANDED IN PART. ON CROSS APPEAL: AFFIRMED.**

**WALLER, C.J., DICKINSON, P.J., CHANDLER, PIERCE AND KING, JJ., CONCUR.    RANDOLPH, P.J., LAMAR AND COLEMAN, JJ., NOT PARTICIPATING.**