# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2021-CT-00740-SCT

*JEFFREY CLYDE PITTS*

*v.*

*STATE OF MISSISSIPPI*

### ON WRIT OF CERTIORARI

DATE OF JUDGMENT:   02/11/2021
TRIAL JUDGE:     HON. JOHN H. EMFINGER
TRIAL COURT ATTORNEYS:  J. EDWARD RAINER
           KIMBERLY M. PHILLIPS
           KATHRYN WHITE NEWMAN
COURT FROM WHICH APPEALED: RANKIN COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT: J. EDWARD RAINER
           KIMBERLY M. PHILLIPS
ATTORNEYS FOR APPELLEE:  OFFICE OF THE ATTORNEY GENERAL
           BY: LAUREN GABRIELLE CANTRELL
            ALEXANDRA RODU ROSENBLATT
DISTRICT ATTORNEY:   JOHN K. BRAMLETT, JR.
NATURE OF THE CASE:   CRIMINAL - FELONY
DISPOSITION:     AFFIRMED - 03/20/2025
MOTION FOR REHEARING FILED:

  **EN BANC.**

  **RANDOLPH, CHIEF JUSTICE, FOR THE COURT:**

¶1. In February 2021, Jeffrey Pitts was convicted for sexually battering his four-year-old daughter, AGC. *See* Miss. Code Ann. § 97-3-95(1)(d) (Rev. 2020). The Court of Appeals upheld his conviction. ***Pitts v. State***, No. 2021-KA-00740-COA, 2023 WL 1425289 (Miss. Ct. App. Jan. 31, 2023). Four Justices granted Pitts's petition for writ of certiorari. *See* Miss. R. App. P. 17(a) ("The Supreme Court may grant a petition for writ of certiorari on the

affirmative vote of four of its members . . . .").  Finding that Pitts received the protections guaranteed by the right to confrontation not only under the United States Constitution but also under the Mississippi Constitution, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     AGC and her grandmother (Gram) were having a normal day following AGC's return from spending the weekend of May 1-3, 2020, with her father, Pitts.  While taking a break from schoolwork, AGC pulled Gram's arm, saying, "let's talk."  AGC informed Gram that she "saw daddy's gina."  Gram responded, "[o]h, ok."  Gram changed the topic.  A few minutes later, Gram said, "[l]et's go talk to [M]om[m]a."

¶3.     AGC repeated to Momma what she had told Gram—she saw her father's "vagina."  The child had been taught the anatomically correct words to describe female anatomy, but she had not been taught words to describe the male anatomy.  When asked where her nine-year-old half sister was, AGC responded that she was in her own bedroom.  Momma also asked where Pitts's mother was, and AGC responded that Pitts's mother was in the living room.  AGC did not want to talk about it any longer.  They did not.

¶4.     Later that night, Momma asked AGC whether she simply saw her father naked in a bathroom, because, "to me I'm thinking . . . she's four.  She has no [sense] of privacy at that age and . . . did she sling the bathroom door open; did she . . . walk in while he was using the rest room or changing clothes?"  AGC said that she saw "it" when she and Pitts were in his bed taking an afternoon nap and that Pitts was naked.  AGC further told Momma that she

2

touched Pitts's "vagina," and then she stated, "[a]nd daddy put his finger in my vagina, in my gina and in my bootie and he made it go real fast."

¶5.    When Momma asked whether it hurt, she responded, "[b]ut I love my daddy," and "he's my family and family is important" while repeating several times that Pitts put his finger in her "bootie" and vagina. AGC chose not to talk any longer and left to use the bathroom. After a few minutes, Momma became concerned and asked if she was alright. She answered, "[y]eah . . . it kind of burned a little like when daddy put his finger in my gina."

¶6.    Momma contacted Child Protection Services. She also filed a report with the Rankin County Sheriff's Office and the Richland Police Department (RPD). Both referred the victim to the Child Advocacy Center (CAC) for a forensic interview.

¶7.    An officer was dispatched by RPD to take a report. He met with Momma, who provided him with a written statement detailing the events that occurred. A detective was assigned to investigate. The detective followed up with Momma and contacted the CAC. The detective also spoke with Gram and the mother of Pitts's nine-year-old daughter. She never spoke with AGC, as Rankin County followed a protocol requiring CAC to conduct all interviews of young victims. "They need to be specially trained in order to speak with the child." The detective observed the forensic interview, however. At its conclusion, she signed an affidavit to arrest Pitts.

¶8.    A video recording of AGC's forensic interview was played to the jury in its entirety. AGC informed the social worker (SW) that "[w]hen I was trying to sleep he dug his finger

3

in my vagina, [and] . . . when he was done he said touch mine, touch mine." AGC stated that no one else had ever done such acts to her. When asked by the SW whether anyone told her what to say during the interview, AGC denied that anyone had.

¶9.     In August 2020, a Rankin County grand jury indicted Pitts for sexual battery under Mississippi Code Section 97-3-95(1)(d) (Rev. 2020). Pitts's trial began in February 2021. After the jury was selected, the trial court held a tender years hearing outside their presence pursuant to Mississippi Rule of Evidence 803(25).[1] Gram, Momma, and the SW each testified at the tender years hearing as to what AGC had told them. Before reaching a decision, the trial judge stated that he had heard all arguments of counsel and that he had reviewed all of the evidence presented, including the written statements and video of AGC's CAC interview. The trial judge then acknowledged that the question for him to determine

---

[1]Under Rule 803(25):

A statement by a child of tender years describing any act of sexual contact with or by another is admissible if:

**(A)**     the court—after a hearing outside the jury's presence—determines that the statement's time, content, and circumstances provide *substantial indicia of reliability*; *and*

**(B)**     *the child* either:

(i)     *testifies*; or

(ii)     is unavailable as a witness, and other evidence corroborates the act.

Miss. R. Evid. 803(25) (emphasis added).

4

was whether the time, content, and circumstances of AGC's statements provided substantial indicia of reliability. After analyzing each and every factor,[2] the trial judge ruled that AGC's statements indeed provided a substantial indicia of reliability and that "it's for a jury to decide the credibility of those statements."

¶10.    Before AGC testified, the State moved under Mississippi Code Section 99-43-101(2)(g) to put in place a screen that would obstruct her view of Pitts. It reads:

> (2)    In any proceeding in which a child testifies, a child *shall have* the following rights to be enforced by the court on its own motion or upon motion or notice of an attorney in the proceeding:
>
> . . . .
>
> (g)    To permit the use of a properly constructed screen that would permit the *judge* and *jury* in the courtroom or hearing room to see the child but would obscure the child's view of the defendant or the public or both.

Miss. Code Ann. § 99-43-101(2)(g) (Rev. 2020) (emphasis added).

---

[2]The advisory committee notes to Rule 803(25) sets forth that

> Some factors that the court should examine to determine if there is sufficient indicia of reliability are (1) whether there is an apparent motive on declarant's part to lie; (2) the general character of the declarant; (3) whether more than one person heard the statements; (4) whether the statements were made spontaneously; (5) the timing of the declarations; (6) the relationship between the declarant and the witness; (7) the possibility of the declarant's faulty recollection is remote; (8) certainty that the statements were made; (9) the credibility of the person testifying about the statements; (10) the age or maturity of the declarant; (11) whether suggestive techniques were used in eliciting the statement; and (12) whether the declarant's age, knowledge, and experience make it unlikely that the declarant fabricated.

Miss. R. Evid. 803(25) advisory comm. n.

5

¶11.   Defense counsel objected, contending that use of the screen would violate Pitts's right

to confrontation, as

> The only . . . thing that a shield would do in this particular case is to shield the
> child so that she won't make any kind of . . . gestures or any kind of signs that
> she still loves her father, that she's not afraid of her father. . . .  So I would .
> . . say . . . that it's not necessary in this case.  It's not warranted in this case. .
> . .  Why does the State want to keep the father from seeing the child?  There's
> been no . . . offer . . . by the State why this is necessary.  There's been no proof
> of why it is necessary.  The only thing that the State wants to do is to try to
> keep this child from . . . exhibiting any kind of affection for Mr. Pitts in the
> presence of this jury . . . .

¶12.   The State responded that

> [T]he defendant's confrontation right is not violated. . . .  He will be able to
> hear the witness.  He will be in the same room as the witness. . . . [H]is
> attorney has the right to confront that witness, to cross-examine her.  Judge, in
> this case we have a four-year-old child.  At the request of her guardian, she
> believes that it will be difficult for [AGC] to testify while her father is staring
> at her.

¶13.   The State further contended that the screen would be effective in preventing AGC

from becoming distracted due to her young age.  Moreover, the State argued that

> The statute states that she shall have that right and I'm not required to put on
> any proof that she be scared of the defendant.  That would only be in the case
> where we'd asked for a deposition of the testimony of the victim rather than
> live testimony and we certainly don't want that.  We do, in fact, want [AGC]
> to testify live and we would ask again, pursuant to her rights which is found
> . . . in that section under the Mississippi Crime Victim's Bill of Rights that she
> shall be given that right if it's requested.

¶14.   After the trial judge had meticulously considered the opposing arguments, case law,

and Section 99-43-101, the trial judge ruled that

> I'm confronted with a couple of things.  Number (1) I'm looking at a statute
> that appears to be mandatory . . . .  I've heard the cases that you all have cited.

6

. . . [W]e're not going to stop the trial at this point, I guess, to be able to provide for some type of video so that the defendant could see—

. . . .

No, I think I am going to do that. I am going to grant your motion only if we can provide—I'm doing it hesitantly because I'm concerned about the constitutionality of the statute. But I'm only going to grant your motion if we can arrange for there to be a zoom so that the defendant can observe the witness as the witness is testifying. We've gone through that in the courtroom before. . . . there will be no need for the sound to be on . . . . Because the courtroom sound system, [you all will] be able to hear there.

¶15. The screen and Zoom video were put in place. Defense counsel reiterated his objection, stating that "I think that the jury is entitled to know what the relationship between these parties are and how much both of them love each other." The trial judge responded:

*And you can certainly do that*, [defense counsel], *through your examination of the child*. And you know, *I think the point of this is a truth-seeking mission to try and have truthful testimony* and to the degree that the legislature is determined that this is appropriate and as long as the constitutional safeguards are met, I believe I'm compelled to follow the statute with this procedural safeguard by allowing the Defendant to view the child as the child testifies so that he can assist in cross-examination then. So we're going to go forward with that. We'll bring the jury in and then we'll call the little girl in.

(Emphasis added.)

¶16. On direct and cross-examination, AGC testified that she understood the importance of telling the truth and that she gets into trouble when she does not tell the truth. AGC related that she loved her father. She testified that when she stayed at her mother's house, she slept in her own bed; however, when she stayed at Pitts's residence, she slept with him in his bed. When asked whether she remembered Pitts touching her the last time that she stayed with him, AGC testified that her father touched her "[i]n my bootie and my vagina"

7

and that Pitts touched her "[w]ith his finger" on the "inside" of her vagina. When asked how many times Pitts did that to her, she responded, "[h]e did it, like, a few times."

¶17. When asked whether she remembered if Pitts ever applied diaper cream on her, she responded that "[s]ometimes he put it on my nosey. . . . On my bootie. . . . And he put some on my belly." The State questioned whether the time that Pitts put his fingers inside her vagina and "bootie" was a different occurrence than when Pitts put diaper cream on her. AGC responded that it was, and also stated that it felt "[n]ot good" when Pitts put his finger in her vagina. When AGC was asked whether her mother ever touched her there, she responded that she never had, nor had anyone else.

¶18. AGC was thoroughly cross-examined by Pitts's counsel. Through extensive questioning, Pitts's counsel attempted to convey to the tribunal that AGC possessed a tendency to tell big stories and exaggerate. Counsel asked if she loved her father. She replied that she did. AGC agreed that she wanted to see her father. Pitts's counsel asked whether she got to see her father anymore. She answered that she did not. When asked why, she stated "[b]ecause I miss him. He's my daddy." Pitts's counsel repeated the question; then, she answered, "[b]ecause he did a bad thing to me."

¶19. AGC told defense counsel that she did not inform her mother right away "[b]ecause I thought she was going to be mad at me." When asked who told her that Pitts did a bad thing to her, at first she stated, "[m]y mommy," then she stated, "[b]ut I actually told my momma." She then testified, "[n]o. I already knew that. I just told my mommy." Counsel

8

attempted to convince the jury that her memory was incomplete, confusing her father's sexual exploitation with application of diaper cream.

¶20. When asked whether she informed the SW that it hurt when Pitts put his finger in her vagina, AGC answered, "[i]t did hurt." AGC recalled telling her mother that she loved her daddy and that "he's family and family is important," and she asserted that Pitts was still important to her.

¶21. AGC expressed that she wanted to see Pitts again even though he put his finger in her vagina. She related that she had a plan to avoid further abuse: "I will just sleep somewhere else . . . ." Before the jury, AGC testified that "I've been missing him and I've been crying—well, I better not cry. I've been missing him and wanting to talk to him and go live with him." But "[h]e just did that. . . . He—he did that. He just did that, but—he really did." When asked who told her that Pitts really did "that," she responded, "I already knew it because I've been to his house."

¶22. On redirect examination, the State asked AGC why she thought that her mother would be mad at her for what her father had done. She responded, "[b]ecause I thought it wasn't—I thought—I didn't want my momma to be mad at me because I told daddy to do it." When the State asked, "[a]nd then sometimes you said daddy would do it without you asking him to do it," she answered, "[u]h-huh." When asked, "why don't you want to sleep in the bed with daddy anymore[?]" she responded, "[b]ecause what if he does that again?" The State asked her what "that" meant. AGC answered, "I don't want him to put it in my vagina again."

9

**DISCUSSION**

¶23. Pitts contends that the trial judge's decision to grant the State's motion under Mississippi Code Section 99-43-101(2)(g) (Rev. 2020) without making a specific finding that AGC would suffer emotional trauma from testifying face to face with him violated his right to confrontation. Pitts cited two decisions in support of his contention—*Coy v. Iowa*, 487 U.S. 1012, 108 S. Ct. 2798, 101 L. Ed. 2d 857 (1988), and *Maryland v. Craig*, 497 U.S. 836, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990).

¶24. "In reviewing questions of law, this Court proceeds de novo." *Harrison v. State*, 800 So. 2d 1134, 1136 (Miss. 2001) (citing *Sykes v. State*, 757 So. 2d 997, 999 (Miss. 2000)). It has long been the view of this Court that in reviewing any statute, our role begins and ends with the statutory text, which is the alpha and the omega of the interpretive process. *See Miss. Dep't of Mental Health v. Lamar Cnty. (In re C.W.)*, 250 So. 3d 1248, 1252 (Miss. 2018); *see also Weatherly v. Pershing, L.L.C.*, 945 F.3d 915, 921 (5th Cir. 2019) (The United States Court of Appeals for the Fifth Circuit agrees, finding that "[w]hen a statute controls, our first stop (and usually our last) is the statutory text."). Mississippi Code Section 99-43-101(2)(g) reads:

> (2) In any proceeding in which a child testifies, a child *shall have* the following rights to be enforced by the court on its own motion or upon motion or notice of an attorney in the proceeding:
>
> . . . .
>
> (g) To permit the use of a properly constructed screen that would permit the judge and jury *in the courtroom* or hearing room to see the child but would obscure the child's view of the defendant or the public or both.

10

Miss. Code Ann. § 99-43-101(2)(g) (Rev. 2020) (emphasis added).[3]

¶25. "In matters concerning statutory construction, '[t]he function of the Court is not to decide what a statute should provide, but to determine what it does provide.'" *Smith v. Webster*, 233 So. 3d 242, 247 (Miss. 2017) (alteration in original) (quoting *Lawson v. Honeywell Int'l, Inc.*, 75 So. 3d 1024, 1027 (Miss. 2011)). "When a statute is unambiguous, [we apply] . . . the plain meaning of its words." *Wallace v. State*, 360 So. 3d 231, 235 (Miss. 2023) (alterations in original) (quoting *Smith*, 233 So. 3d at 247).

¶26. The plain words of Mississippi Code Section 99-43-101(2)(g) (Rev. 2020) unambiguously do not require a trial judge to make a specific finding of emotional trauma before allowing the application of a screen. Moreover, the plain words of Section 99-43-101(2)(g) do not require a trial judge to set up video equipment to ensure that the defendant can see the child witness while they testify from behind a screen as was permitted in the case sub judice.

¶27. Unquestionably, "[t]he [C]ourt has no right to add anything to or take anything from a statute, where the meaning of the statute is clear . . . ." *State v. Traylor*, 100 Miss. 544, 56 So. 521, 523 (1911). It is a longstanding principle that

> the legislature possesses the whole law-making power of the State, and may pass any law which does not contravene the provisions of the State constitution, or the constitution of the United States. With these exceptions, the legislature has the absolute, unlimited sovereign power of making laws. These laws, when made, although in the opinion of the court they may be unwise, impolitic, unjust, and oppressive, yet, if they do not contravene the provisions of the constitution of the United States, or of the State constitution, are imperative and obligatory, and it is the duty of the court to enforce them.

---

[3]*See* Miss. Const. art. 3, § 26A(3), *infra* ¶ 36.

*State v. Johnson*, 25 Miss. 625, 783 (1853).

¶28.    In determining whether a legislative enactment indeed contravenes the constitutions of either this state or of the United States, we begin with "a strong presumption of validity[.]" *City of Starkville v. 4-Cnty. Elec. Power Ass'n*, 909 So. 2d 1094, 1112 (Miss. 2005). "A 'very heavy burden' rests upon this Court before it may find a statute unconstitutional." *State v. Bd. of Levee Comm'rs for Yazoo-Miss. Delta*, 932 So. 2d 12, 19 (Miss. 2006) (citing *Moore v. Bd. of Supervisors of Hinds Cnty.*, 658 So. 2d 883, 887 (Miss. 1995)). The unconstitutionality of a statute must be evident beyond a reasonable doubt. *Id.* (quoting *Cities of Oxford, Carthage, Starkville & Tupelo v. Ne. Elec. Power Ass'n*, 704 So. 2d 59, 65 (Miss. 1997)). "Moreover, 'to state that there is doubt regarding the constitutionality of an act is to essentially declare it constitutionally valid.'" *Id.* at 20 (quoting *Moore*, 658 So. 2d at 887).

¶29.    The right to confront one's accusers is an Anglo-American common law right that long predated the ratification of the United States Constitution. *Salinger v. United States*, 272 U.S. 542, 548, 47 S. Ct. 173, 71 L. Ed. 398 (1926) ("The right of confrontation did not originate with the provision in the Sixth Amendment, but was a common-law right having recognized exceptions."). In the Bill of Rights, the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend. VI. Similarly, the Mississippi Constitution sets forth that "[i]n all criminal prosecutions the accused shall have a right . . . to be confronted by the witnesses against him . . . ." Miss. Const. art. 3, § 26.

12

¶30.    The United States Supreme Court has established that:

> The *primary object* of the constitutional provision in question was to prevent depositions or ex parte affidavits, such as were sometimes admitted in civil cases, being used against the prisoner *in lieu of personal examination and cross-examination of the witness*, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand *face to face with the jury* in order that they may look at him, *and judge* by *his demeanor upon the stand* and the *manner* in which *he* gives his *testimony whether he is worthy of belief*. There is doubtless reason for saying that the accused should never lose the benefit of any of these safeguards even by the death of the witness; and that, if notes of his testimony are permitted to be read, he is deprived of the advantage of that personal presence of the witness *before the jury* which *the law has designed for his protection*.  But general rules of law of this kind, however beneficent in their operation and valuable to the accused, must occasionally give way to considerations of public policy and the necessities of the case.[4]  To say that a criminal, after having once been convicted by the testimony of a certain witness, should go scot free simply because death has closed the mouth of that witness, would be carrying his constitutional protection to an unwarrantable extent.  *The law*, in its wisdom, *declares that the rights of the public* shall not be *wholly sacrificed* in order that an *incidental* benefit may be preserved to the accused.

*Mattox v.  United States*, 156 U.S. 237, 242-43, 15 S. Ct. 337, 39 L. Ed. 409 (1895)

(emphasis added).[5]

---

[4]Public policy exceptions to Constitutional protections have long been recognized. *See* **Schenck v. United States**, 249 U.S. 47, 52, 39 S. Ct. 247, 63 L. Ed. 470 (1919) ("The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic." (citing **Gompers v. Buck's Stove & Range Co.**, 221 U.S. 418, 439, 31 S. Ct. 492, 55 L. Ed. 797 (1911))).

[5]United States Supreme Court decisions that cite this passage from **Mattox** include: **Dowdell v. United States**, 221 U.S. 325, 330, 31 S. Ct. 590, 55 L. Ed. 753 (1911); **Salinger**, 272 U.S. at 548; **Pointer v. Texas**, 380 U.S. 400, 407, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965); **Douglas v. Alabama**, 380 U.S. 415, 418-19, 85 S. Ct. 1074, 13 L. Ed. 2d 934 (1965); **Barber v. Page**, 390 U.S. 719, 721, 88 S. Ct. 1318, 20 L. Ed. 2d 255 (1968); **California v. Green**, 399 U.S. 149, 158, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970); **Dutton v. Evans**, 400 U.S. 74, 80, 91 S. Ct. 210, 27 L. Ed. 2d 213 (1970); **Chambers v. Mississippi**, 410 U.S. 284, 295, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973); **Ohio v. Roberts**, 448 U.S. 56, 63-64, 100 S.

¶31. The United States Supreme Court has consistently defined the elements of confrontation as: (1) the witness is under oath, (2) the witness is subject to cross-examination, and (3) the witness is under observation by the *jury*, holding that confrontation:

    (1)    insures that the witness will give his *statements under oath*—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury;

    (2)    *forces* the *witness* to *submit to cross-examination*, the 'greatest legal engine ever invented for the discovery of truth';

    (3)    permits the *jury* that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility.

*Green*, 399 U.S. at 157 (emphasis added) (footnote omitted) (quoting 5 J. Wigmore, *Evidence* § 1367).

¶32. Speaking for the United States Supreme Court, Justice Blackmun later wrote that "*[t]he Court has emphasized that 'a primary interest secured by [the Confrontation Clause] is the right of cross-examination.*" ***Stincer***, 482 U.S. at 736 (alteration in original) (emphasis added) (quoting ***Douglas***, 380 U.S. at 418 ("Our cases construing the clause hold that a primary interest secured by it is the right of cross-examination; an adequate opportunity for cross-examination may satisfy the clause even in the *absence of physical confrontation*." (emphasis added))).

---

Ct. 2531, 65 L. Ed. 2d 597 (1980), *abrogated on other grounds by **Crawford v. Washington***, 541 U.S. 36, 68-69, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004); ***Kentucky v. Stincer***, 482 U.S. 730, 737, 107 S. Ct. 2658, 96 L. Ed. 2d 631 (1987); ***United States v. Owens***, 484 U.S. 554, 557, 108 S. Ct. 838, 98 L. Ed. 2d 951 (1988); ***Maryland v. Craig***, 497 U.S. 836, 845, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990); ***Crawford***, 541 U.S. at 59 n.9.

¶33.   Clearly, the most sacred element of confrontation is the right to subject one's accuser to a full and complete cross-examination of their testimony.   *See **Dowdell***, 221 U.S. at 330 ("[The Confrontation Clause] was intended . . . particularly *to preserve the right of the accused to test the recollection of the witness in the exercise of the right of cross-examination*." (emphasis added) (citing ***Mattox***, 156 U.S. at 242-43)); *see also **Pointer***, 380 U.S. at 406-07 ("As has been pointed out, *a major reason underlying the constitutional confrontation rule is to give a defendant charged with crime an opportunity to cross-examine the witnesses against him*." (emphasis added)); ***Davis v. Alaska***, 415 U.S. 308, 315-16, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974) ("*The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination*." (emphasis added) (internal quotation mark omitted) (quoting 5 J. Wigmore, *Evidence* § 1395 (3d ed. 1940))).

¶34.   Post ***Coy*** and ***Craig***, Mississippi, like a majority of states toward the end of the twentieth century, joined a public policy movement of enshrining the rights of crime victims into their state constitutions.[6]   In 1998, a victims' rights amendment to the Mississippi

---

[6]As of 2005, "[a] total of thirty-three states now have state victims' rights amendments." Jon Kyl, et al., *On the Wings of Their Angels: The Scott Campbell, Stephanie Roper, Wendy Preston, Louarna Gillis, and Nila Lynn Crime Victims' Rights Act*, 9 Lewis & Clark L. Rev. 581, 583-91 (2005) (citing Ala. Const. amend. 557; Alaska Const. art. I, § 24; Ariz. Const. art. II, § 2.1; Cal. Const. art. I, § 28; Colo. Const. art. II, § 16a; Conn. Const. art. I, § 8(b); Fla. Const. art. I, § 16(b); Idaho Const. art. I, § 22; Ill. Const. art. I, § 8.1; Ind. Const. art. I, § 13(b); Kan. Const. art. XV, § 15; La. Const. art. I, § 25; Md. Const. Decl. of Rights art. XLVII; Mich. Const. of 1963, art. I, § 24; Miss. Const. art. III, § 26A; Mo. Const. art. I, § 32; Mont. Const. art. II, § 28; Neb. Const. art. I,§ 28; Nev. Const. art. I, § 8; N.J. Const. art. I, § 22; New Mex. Const. art. II, § 24; N.C. Const. art. I, § 37; Ohio Const. art. I, § 10a; Okla. Const. art. II, § 34; Or. Const. art. I, § 42; R.I. Const. art. I, § 23; S.C. Const. art. I,§ 24; Tenn. Const. art. I, § 35; Tex. Const. art. I, § 30; Utah Const. art. I, § 28; Va. Const. art. I, § 8-A; Wash. Const. art. I, §35; Wis. Const. art. I, § 9m).

Constitution was proposed by the Senate Constitution Committee. S. Con. Res. No. 513, Reg. Sess., 1998 Miss. Laws ch. 691. Senate Concurrent Resolution Number 513 was unanimously adopted by the Senate. S. Journal, 1998 Reg. Sess. 50 (Mar. 17, 1998). The House of Representatives unanimously adopted the proposed constitutional amendment as well. H.R. Journal, 1998 Reg. Sess. 681 (Mar. 5, 1998).

¶35. On November 3, 1998, the legislatively referred constitutional amendment, the "Mississippi Crime Victim Rights Amendment," also known as "Amendment 2," was put on the ballot. The electorate overwhelmingly approved the amendment with 93.3 percent of the vote in favor of the proposed constitutional provision.[7]

¶36. That provision, Article 3, Section 26A, of the Mississippi Constitution unambiguously provides, in part, "[t]he Legislature *shall have the authority to enact substantive and procedural laws to define, implement, preserve and protect the rights guaranteed to victims by this section*." Miss. Const. art. 3, § 26A(3) (emphasis added). In addition, Section 26A establishes that "[n]othing in this section shall . . . impair the constitutional rights of the accused." Miss. Const. art. 3, § 26A(2). Following this overwhelming statement of public policy by the Mississippi electorate, as well as by legislative and executive branches of government, the Mississippi Crime Victims' Bill of Rights was enacted pursuant to the constitutional authority granted in Section 26A. *See* Miss. Code Ann. §§ 99-43-1 to -101 (Rev. 2020). That constitutional provision has been cited by this Court on multiple

---

[7]Mississippi Crime Victim Rights, Amendment 2 (1998), Ballotpedia, https://ballotpedia.org/Mississippi_Crime_Victim_Rights,_Amendment_2_(1998) (last visited Jan. 15, 2025).

16

occasions. *See Payton v. State*, 266 So. 3d 630, 637 (Miss. 2019); *see also Moffett v. State*, 351 So. 3d 936, 943 (Miss. 2022).

¶37.    Mississippi Code Section 99-43-1 established that the

> purpose of this chapter is to ensure the fair and compassionate treatment of victims of crime, to increase the effectiveness of the criminal justice system by affording rights and considerations to the victims of crime, and to preserve and protect victims' rights to justice and fairness in the criminal justice system.

Miss. Code Ann. § 99-43-1 (Rev. 2020).   Mississippi Code Section 99-43-101(2)(g) (Rev. 2020) is included within the Mississippi Crime Victims' Bill of Rights.  It is specifically limited to the *live* testimony of a child in a courtroom.

¶38.    Importantly, Mississippi Code Section 99-43-101(5)(d) also establishes that "[t]he defendant shall be afforded the rights applicable to defendants during trial, including the right to an attorney, the right to be confronted with the witness against the defendant, and the right to cross-examine the child."  Miss. Code Ann. § 99-43-101(5)(d) (Rev. 2020).

¶39.    Unlike the statute at issue in today's case, in *Coy*, an Iowa statute was challenged that read:

> The court may require a party be confined [*sic*] to an adjacent room or behind a screen or mirror that permits the party to see and hear the child during the child's testimony, but does not allow the child to see or hear the party. However, if a party is so confined, the court shall take measures to insure that the party and counsel can confer during the testimony and shall inform the child that the party can see and hear the child during testimony.

*Coy*, 487 U.S. at 1014 n.1 (alteration in original) (internal quotation marks omitted) (quoting Iowa Code § 910.14 (1987)).  Unlike the case sub judice, Iowa did not have a victims' rights provision enshrined in its state constitution when *Coy* was decided.  Moreover, the procedure

contained in the Iowa statute at issue in *Coy* was discretionary while the statutory procedure at issue in today's case is unambiguously mandatory.

¶40.    The Supreme Court was not persuaded by Iowa's purported justification, however; it found that "[i]t is true that we have in the past indicated that rights conferred by the Confrontation Clause are not absolute, and may give way to other important interests." ***Coy***, 487 U.S. at 1020.  Accordingly, the Supreme Court ultimately held that

> *We leave for another day*, however, the question whether any exceptions exist. Whatever they may be, they *would surely be allowed only when necessary to further an important public policy*.  The State maintains that such necessity is established here by the statute, *which creates a legislatively imposed presumption of trauma*.  Our cases suggest, however, that even as to exceptions from the normal implications of the Confrontation Clause, as opposed to its most literal application, *something more than the type of generalized finding underlying such a statute is needed when the exception is not "firmly . . . rooted in our jurisprudence*."  The exception created by the Iowa statute, which was passed in 1985, could hardly be viewed as firmly rooted.  Since there have been no individualized findings that these particular witnesses needed special protection, the judgment here could not be sustained by any conceivable exception.

*Id.* at 1021 (alteration in original) (citation omitted) (emphasis added).

¶41.    The victims in ***Coy*** were two *thirteen-year-old* girls. ***Id.*** at 1014.  AGC was four years old at the time of Pitts's trial.  Accordingly, *Coy* failed to consider that the common law has always provided protections to children of an extremely young age or that the law has often carved out exceptions for these individuals of tender age.  For example, this Court has written that "[a]t common law a child under 7 years of age is conclusively presumed to be *without discretion*, and incapable of committing crime . . . ," not requiring a hearing before they may take the witness stand.  ***Westbrook v. Mobile & Ohio R.R. Co.***, 66 Miss. 560, 6 So.

18

321, 322 (1889) (second emphasis in original) (citing 1 Bishop, *Criminal Law* § 368; 1 Wharton, *Criminal Law* § 68). This is because "[a] child of such age is generally incapable of choosing between *right and wrong*, *between good and evil*, and *between care and rashness*." **Id.** (emphasis added); *see also* **Hines v. Moore**, 124 Miss. 500, 87 So. 1, 3 (1921).

¶42. The victims in **Coy** were camping out and assaulted by an *unknown masked* man. **Coy**, 487 U.S. at 1014. Unlike today's case, in **Coy**, the identity of the perpetrator was a factual question for the jury to resolve, as "[a]ccording to the girls, the assailant entered their tent after they were asleep wearing a stocking over his head, shined a flashlight in their eyes, and warned them not to look at him; neither was able to describe his face." **Id.**

¶43. Two years later in **Craig**, **Coy** was weakened considerably. There,

> the State sought to invoke a Maryland statutory procedure that permits a judge to receive, by one-way closed circuit television, the testimony of a child witness who is alleged to be a victim of child abuse. To invoke the procedure, the trial judge must first "determin[e] that testimony by the child victim in the courtroom will result in the child suffering serious emotional distress such that the child cannot reasonably communicate."

**Craig**, 497 U.S. at 840-41 (alteration in original) (quoting Md. Code Ann., Cts. & Jud. Proc. § 9-102(a)(1)(ii) (1989)). No such requirements for a four-year-old victim of sexual abuse by their parent exists in Section 99-43-101(2)(g).

¶44. Another clear distinction from Section 99-43-101(2)(g), moreover, is:

> Once the procedure is invoked, the child witness, prosecutor, and defense counsel withdraw to a separate room; the judge, jury, and defendant remain in the courtroom. The child witness is then examined and cross-examined in the separate room, while a video monitor records and displays the witness' testimony to those in the courtroom. During this time the witness cannot see

19

the defendant. The defendant remains in electronic communication with defense counsel, and objections may be made and ruled on as if the witness were testifying in the courtroom.

*Craig*, 497 U.S. at 841-42.

¶45.    Like *Coy*, Maryland had no victims' rights provision enshrined in its state constitution when *Craig* was decided. Most importantly, the examination of the child witnesses in *Craig* were conducted outside the physical presence of not only the defendant but also the *jury and judge*. *See Craig*, 497 U.S. at 841 (emphasis added) ("Once the procedure is invoked, *the child witness, prosecutor, and defense counsel withdraw to a separate room; the judge, jury, and defendant remain in the courtroom*."). Similar distinctions were not present in today's case.

¶46.    Yet the Court in *Craig* found that

> [t]he combined effect of these elements of confrontation—*physical presence, oath, cross-examination*, *and observation of demeanor by the trier of fact*—serves the purposes of the Confrontation Clause by *ensuring* that *evidence admitted* against an accused *is reliable* and *subject to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings*.

*Id.* at 846 (emphasis added). While acknowledging that face-to-face confrontation may well provide some *symbolic value* to an accused, the majority found that the Supreme Court had also "nevertheless recognized that it is not the *sine qua non*[8] of the confrontation right." *Craig*, 497 U.S. at 847 (citing *Delaware v. Fensterer*, 474 U.S. 15, 22, 106 S. Ct. 292, 88 L. Ed.2d 15 (1985) (per curiam). As it said in *Coy*, the Court held that the right to face-to-face

---

[8]I.e., "something absolutely indispensable or essential." *Sine qua non*, Merriam-Webster, https://www.merriam-webster.com/dictionary/sine%20qua%20non (last visited Mar. 13, 2025).

confrontation was *not absolute*. ***Craig***, 497 U.S. at 844 ("We have never held, however, that the Confrontation Clause guarantees criminal defendants the *absolute* right to a face-to-face meeting with witnesses against them at trial.").

¶47. Today's case is about live testimony. Pitts, however, conflates the requirements of Mississippi Code Section 99-43-101(5)(a) (Rev. 2020)—out of court deposition testimony—or Mississippi Code Section 99-43-101(5)(e) (Rev. 2020)—out of court testimony via closed circuit television—with Mississippi Code Section 99-43-101(2)(g), which unambiguously controls live testimony provided in open court. In ***Craig***, the child witnesses testified in a *separate room* from the *jury*, which is charged with deciding guilt or innocence based on the evidence presented. ***Craig***, 497 U.S. at 841. Absent testifying in open court in the presence of the *jury*, an essential truth-finding element of the right to confrontation was limited. In such circumstances, to qualify as an exception to the Confrontation Clause, the trial judge must make certain findings to justify the limitation. The Mississippi legislature specifically provides for these certain circumstances by including Mississippi Code Section 99-43-101(5) within the Mississippi Crime Victims' Bill of Rights.

¶48. When introducing a child witness's *deposition* testimony, "[t]he court shall make a preliminary finding as to whether . . . the child is likely to be *unable* to testify in *open court* in the physical presence of the defendant, jury, judge, or public . . . " when a child cannot testify due to "fear," "emotional trauma," or "suffers a mental or other infirmity or medical condition[.]" Miss. Code Ann. § 99-43-101(5)(a), (b) (Rev. 2020) (emphasis added). Likewise, to utilize testimony via closed-circuit television,

21

[i]f the court finds the child *unable* to testify in open court, based on evidence that the child is unable to testify in the physical presence of the defendant, the court may order that the defendant, including a defendant represented pro se, be excluded from the room in which the deposition is conducted.

Miss. Code Ann. § 99-43-101(5)(e)(i) (Rev. 2020) (emphasis added).[9]  Accordingly, "[i]f the court orders that the defendant be excluded from the deposition room, the court shall order that two-way closed-circuit television equipment be used . . . ." *Id.*

¶49.    The Supreme Court in *Craig* held that "*we cannot say* that such *confrontation* is an *indispensable element* of the *Sixth Amendment's guarantee* of the right to confront one's accusers." *Craig*, 497 U.S. at 849-50 (emphasis added).  Accordingly,

[a]s we suggested in *Coy*, our precedents confirm that a defendant's right to confront accusatory witnesses may be satisfied *absent a physical, face-to-face confrontation at trial* only where denial of such confrontation *is necessary to further an important public policy* and only where *the reliability of the testimony is otherwise assured*.

*Id.* at 850 (emphasis added).

¶50.    What could be a more clear statement of public policy than a right enshrined in a state's constitution at the direction of the electorate of that state?  What could be more necessary than protecting such a statement of the people?  "It is well settled that the Constitution of Mississippi is the supreme law of our state.  It 'is the highest known law.[']" *Chevron U.S.A., Inc. v. State*, 578 So. 2d 644, 648 (Miss. 1991) (quoting *McGowan v. State*, 184 Miss. 96, 105, 185 So. 826 (1939)).  "It is an expression of the will of [the] people by whom it was passed and by whom it can only be altered." *Id.* at 649.  "It is our duty to interpret our Constitution when its meaning is put at issue." *Reeves v. Gunn*, 307 So. 3d

---

[9]*See also* Miss. R. Evid. 617.

436, 437 (Miss. 2020) (citing *Alexander v. State ex rel. Allain*, 441 So. 2d 1329, 1333 (Miss. 1983), *overruled on other grounds by 5K Farms, Inc. v. Miss. Dep't of Revenue*, 94 So. 3d 221 (Miss. 2012)). "When interpreting a constitutional provision, we must enforce its plain language." *Johnson v. Sysco Food Servs.*, 86 So. 3d 242, 244 (Miss. 2012) (citing *Dye v. State ex rel. Hale*, 507 So. 2d 332, 349 (Miss. 1987)). "When a court is entreated to interpret the terms of a constitution, a court ought to 'bow with respectful submission to its provisions[.]'" *Butler v. Watson (In re Initiative Measure No. 65)*, 338 So. 3d 599, 607 (Miss. 2021) (quoting *Cohens v. Virginia*, 19 U.S. 264, 377, 6 Wheat. 264, 5 L. Ed. 257 (1821)).

¶51.    Section 99-43-101(2)(g) sets forth no presumption of trauma. The people of this state have voiced their concern that victims of crime are thrust against their will into a complex system of justice without adequate protections. The people of this state recognized that while several provisions in the Mississippi Constitution provided protections for those accused of crimes, not one provision protected the unwilling victims of these crimes. The screen procedure found in Section 99-43-101(2)(g) was justified by an overwhelming majority of this state's electorate, who enshrined into the Mississippi Constitution the legislative authority to pass laws that provide certain protections for these individuals. Nothing could be more necessary to protect an important policy interest, especially when all of the essential elements of confrontation were met in the case sub judice.

¶52.    It is clear that the reliability of AGC's testimony was assured in today's case. Every element of the right to confrontation was satisfied in Pitts's trial. All witnesses gave live

23

testimony before the jury while under oath. All witnesses were subjected to cross-examination before the jury by Pitts's chosen counsel. All witnesses' demeanor was observable by the jury. At all times, including during the testimony of his four-year-old daughter, AGC, Pitts was present in the same courtroom. At all times, Pitts was able to watch, hear, and assist his counsel while AGC was vigorously cross-examined.

¶53. The screen did not prevent AGC from testifying under oath in real time, nor did the screen prevent her from being impressed upon the seriousness of telling the truth. The jury had front row seats, unobstructed to observe each and every witness, including the child testifying on direct and cross-examination by Pitts's chosen counsel, as well as each and every exhibit. The jury heard from Pitts as he took the stand to defend himself of the accusation and to testify to his version of events. The jury heard AGC express her love for Pitts and observed the sincerity of her testimony. They also heard AGC's childlike plan to resolve the problem—that she "will just sleep somewhere else" whenever she visits Pitts. *See supra* ¶ 21. The jury observed the victim testify that Pitts hurt her and that she did not want him to do it again.

¶54. In addition, Pitts was also able to observe his four-year-old daughter's demeanor while she testified in open court via Zoom video. *See **Mattox***, 156 U.S. at 243 ("The law, in its wisdom, declares that the rights of the public shall not be wholly sacrificed in order that an incidental benefit may be preserved to the accused."); *see also **Davis***, 415 U.S. at 316 ("The opponent demands confrontation, *not for the idle purpose of gazing upon the witness, or of being gazed upon by him, but for the purpose of cross-examination, which cannot be had*

24

*except by the direct and personal putting of questions and obtaining immediate answers.*" (emphasis added) (internal quotation mark omitted) (quoting Wigmore § 1395)).

¶55.    Pitts's accuser, his four-year-old daughter, *testified at trial*, *live* and *under oath* in the presence *of the jury*, that her own father committed unconscionable acts against her.  His daughter was subjected to a *full*, *fair*, and *complete cross-examination* by his selected attorneys.  Not only was AGC's *demeanor* observable to *the jury* and to *the trial judge* alike, who could scrutinize each and every answer that the victim and all other witnesses provided, but also observable to the jury was her quality, age, education, understanding, behavior, and inclination.  Additionally, in **Coy** and **Craig**, there was *no* tender years hearsay hearing predicting the indicia of reliability of the victims' statements.  In today's case, the trial judge's tender years hearing allowed an analysis of the twelve factors, which led to the finding that the victim's statements provided substantial indicia of reliability.  *See supra* ¶ 9 n.2.  The use of the screen to shield AGC's view of her father did not hamper the truth seeking mission of the trial or the reliability of her testimony.

¶56.    The trial judge decided the issue on the most important ground of seeking the truth, ruling that "I'm only going to grant your motion if we can *arrange* for there to be a zoom so that *the defendant can observe* the *witness as the witness is testifying.  We've gone through that in the courtroom before . . . .*" (Emphasis added.)  When defense counsel contended that the jury was entitled to see how much AGC loved her father, the trial judge responded that

> *And you can certainly do that*, [defense counsel], *through your examination of the child*.  And you know, *I think the point of this is a truth-seeking mission to try and have truthful testimony* and to the degree that the legislature is determined that this is appropriate and as long as the constitutional safeguards

25

are met, I believe I'm compelled to follow the statute with this procedural safeguard by allowing the Defendant to view the child as the child testifies so that he can assist in cross-examination then.

(Emphasis added.)

¶57.    Would any student of the law or dedicated jurist disagree that the ascertainment of truth is the ultimate goal of justice? The purpose of our rules of evidence is to "promote the development of evidence law, to the end of ascertaining the truth and securing a just determination." Miss. R. Evid. 102. We have held that "courts exist to determine the truth." *Parker v. Benoist*, 160 So. 3d 198, 204 (Miss. 2015). Similarly, the United States Supreme Court has determined that "[t]he function of a criminal trial is to seek out and determine the truth or falsity of the charges brought against the defendant." *Lopez v. United States*, 373 U.S. 427, 440, 83 S. Ct. 1381, 10 L. Ed. 2d 462 (1963). The Supreme Court further held that "the courtroom . . . is a forum for the courteous and reasoned pursuit of truth and justice." *Taylor v. Hayes*, 418 U.S. 488, 503, 94 S. Ct. 2697, 41 L. Ed. 2d 897 (1974).

¶58.    In today's case, it is abundantly clear that the trial judge had a firm grasp as to his solemn obligations. We grant wide discretion to trial judges on such matters because

> [e]ach case must depend upon its own circumstances, and the trial judge is the person best situated to decide upon the course of conduct necessary to elicit the truth and yet safeguard the rights of the accused, and *unless this Court can say, from the whole record, he abused his discretion and the accused was deprived of a fair and impartial trial*, we should not reverse a case because of such action.

*Summerville v. State*, 207 Miss. 54, 41 So. 2d 377, 380 (1949) (emphasis added).

¶59.    The trial judge in the case sub judice displayed Solomon-like discernment in exercising discretion to satisfy the constitutional and statutory protections provided to both

26

the accused and the victim. We are compelled to imitate his wise example on review. This Court's first and foremost responsibility is to vigilantly guard the provisions of the Mississippi Constitution. Admittedly, this sacred duty becomes complex when the constitutionality of a statute is challenged under one provision of this state's constitution, which was expressly enacted pursuant to the authority granted under the unambiguous words of another provision also contained within this state's constitution. A review of the clear distinctions between the case sub judice and *Coy* and *Craig*, however, demonstrates that Section 99-43-101(2)(g) is not unconstitutional beyond a reasonable doubt. Accordingly, as Pitts received all essential elements of confrontation guaranteed by the Confrontation Clause, we affirm.

¶60. **AFFIRMED.**

**COLEMAN, P.J., ISHEE, SULLIVAN AND BRANNING, JJ., CONCUR. MAXWELL, J., CONCURS IN RESULT ONLY WITH SEPARATE WRITTEN OPINION JOINED BY CHAMBERLIN AND GRIFFIS, JJ. KING, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION.**

**MAXWELL, JUSTICE, CONCURRING IN RESULT ONLY:**

¶61. I voted to deny certiorari review of the Court of Appeals' affirmance and would dismiss as improvidently granted. I join only in the majority's result.

**CHAMBERLIN AND GRIFFIS, JJ., JOIN THIS OPINION.**

**KING, PRESIDING JUSTICE, DISSENTING:**

¶62. Because the mandatory placement of a screen between a child witness and the defendant in this case clearly runs afoul of United States Supreme Court Confrontation Clause precedent, I respectfully dissent.

27

¶63.   This case requires us to examine whether the mandatory placement of a screen between a criminal defendant and a testifying child violated the defendant's rights under the Confrontation Clause of the United States Constitution.  Mississippi Code Section 99-43-101(2)(g) (Rev. 2020)[10] provides:

> (2) In any proceeding in which a child testifies, a child shall have the following rights to be enforced by the court on its own motion or upon motion or notice of an attorney in the proceeding:

> . . . .

> (g) To permit the use of a properly constructed screen that would permit the judge and jury in the courtroom or hearing room to see the child but would obscure the child's view of the defendant or the public or both.

In **Coy v. Iowa**, 487 U.S. 1012, 108 S. Ct. 2798, 101 L. Ed. 2d 857 (1988), the United States Supreme Court found that use of a screen to block the defendant from the view of the complaining witnesses violated the Confrontation Clause and constituted reversible error. While "leav[ing] for another day" the question of whether an exception "necessary to further an important public policy" might exist, the Court stated that such an exception could not be created by a state statute "which creates a legislatively imposed presumption of trauma." **Id.** at 1021.  In **Maryland v. Craig**, 497 U.S. 836, 856, 110 S. Ct. 3157, 111 L. Ed. 2d (1990), the Court upheld a conviction following a trial in which a child witness testified via one-way video camera, holding that the state interest in protecting child witnesses from trauma can justify such a procedure when the trial court hears case-by-case evidence and makes a finding

---

[10] This statute became effective in July 2018.  Our examination of this provision's constitutionality as applied to a particular case is a matter of first impression.

28

that the child "would be traumatized, not by the courtroom generally, but by the presence of the defendant."

¶64.  In the case before us, the trial court permitted the placement of a screen pursuant to the mandatory command of Section 99-43-101(2)(g).  The court did not make a case-specific finding that use of the screen was necessary to prevent trauma to the individual witness, and the State did not present evidence that would support such a finding.  In light of this case's similarity to *Coy* and in the absence of any individualized evidence supporting a public policy exception as outlined in *Craig*, we should find that controlling United States Supreme Court precedent requires us to reverse the defendant's conviction and remand for a new trial.

¶65.  The day before trial in this case, the court conducted a tender-years hearing to determine whether A.G.C.'s mother and grandmother would be permitted to testify regarding the statements A.G.C. made to them describing the abuse.[11]  During the hearing, A.G.C.'s mother discussed the child's emotional attitude toward her father:

> Q.   And I think earlier . . . you said that [A.G.C.], even on the night she made these disclosures to you, she had said that she loved her daddy, right?
>
> A.   Yes.
>
> Q.   And, in fact, I mean [A.G.C.] continues to tell you that –
>
> A.   Yes.
>
> Q.   — she loves her daddy?

---

[11] The court permitted the testimony at trial, and the outcome of the tender-years hearing is not at issue on *certiorari* review.

A. Yes. She is very adamant that she loves her dad, that she misses her dad, that she wants to see her dad. She was very distraught over the fact that she would have to come to court and testify with her daddy in the courtroom and not be able to talk to him.

¶66. Following the conclusion of the tender-years hearing and consideration of other pretrial matters, the State made an *ore tenus* motion pursuant to Section 99-43-101(2)(g), requesting the use of a screen to prevent A.G.C. from viewing Pitts during her testimony the following day. Pitts's attorney objected to the last minute nature of the State's request and argued that the use of the screen would violate Pitts's right to confront the witness. Pitts's attorney argued that "[i]t's very obvious, your Honor, that they don't want the child to see her father because they know that she . . . loves her father and . . . I think it's reprehensible that they would try to . . . prevent him from confronting his accuser." Pitts's attorney argued that the State had presented no proof of why the screen was necessary and that the "only thing that the State wants to do is to try to keep this child from . . . exhibiting any kind of affection for Mr. Pitts in the presence of this jury." The State responded by noting the mandatory nature of the statute and arguing that under the statute, "there are no requirements that the State put on proof on how the child might be affected viewing that defendant in that testimony." The State also argued that the screen would help the child focus and not get distracted and noted that the child's mother thought it would be difficult for A.G.C. to testify while her father was staring at her.

¶67. The trial court stated, "I'm looking at a statute that appears to be mandatory and I have some concerns about my ability to declare the statute unconstitutional and fail to follow it." The court granted the motion "hesitantly because I'm concerned about the constitutionality

of the statute." The screen was erected, and the defendant viewed a live video feed of A.G.C. during her testimony and cross-examination.

¶68. The United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. "[T]he Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." *Coy*, 487 U.S. at 1016. "[T]here is something deep in human nature that regards face-to-face confrontation between accused and accuser as 'essential to a fair trial in a criminal prosecution.'" *Id.* at 1017 (quoting *Pointer v. Texas*, 380 U.S. 400, 404, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965)).

¶69. "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Craig*, 497 U.S. at 845. The United States Supreme Court never has held that the right to a face-to-face confrontation is absolute, but "[a] defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Id.* at 850. "The State can hardly gainsay the profound effect upon a witness of standing in the presence of the person the witness accuses, since that is the very phenomenon it relies upon to establish the potential 'trauma' that allegedly justified" a screen being placed between accuser and accused. *Coy*, 487 U.S. at 1020. "That face-to-face presence may, unfortunately, upset the truthful rape victim or abused child; but by the same token it may

31

confound and undo the false accuser, or reveal the child coached by a malevolent adult. It is a truism that constitutional protections have costs." *Id.*

¶70. In *Coy*, the United States Supreme Court found that the placement of a screen between the defendant and the complaining child witnesses violated the Confrontation Clause. *Coy*, 487 U.S. at 1022. The state statute permitting the use of the screen provided:

> "The court may require a party be confined *[sic]* to an adjacent room or behind a screen or mirror that permits the party to see and hear the child during the child's testimony, but does not allow the child to see or hear the party. However, if a party is so confined, the court shall take measures to insure that the party and counsel can confer during the testimony and shall inform the child that the party can see and hear the child during testimony."

*Id.* at 1014 n.1 (alteration in original) (quoting Iowa Code § 910A.14 (1987)). In describing the function of the screen as enabling "the complaining witnesses to avoid viewing appellant as they gave their testimony," the Court said "[i]t is difficult to imagine a more obvious or damaging violation of the defendant's right to a face-to-face encounter." *Id.* at 1020. The Court declined to consider whether a public-policy exception might apply given the absence of "individualized findings that these particular witnesses needed special protection[.]" *Id.* at 1021. But the Court found that an exception to the protections of the Confrontation Clause *cannot* be created by a "legislatively imposed presumption of trauma." *Coy*, 487 U.S. at 1021.

¶71. The majority attempts to distinguish *Coy* based on several issues that it paints as true distinctions. None of its claimed distinctions are relevant to *Coy*'s holding that individualized findings regarding special protection are necessary to justify infringing on Confrontation Clause rights. First, the majority argues that Iowa did not have a state

constitution victims' rights provision. Maj. Op. ¶ 39. But, the majority seems to admit that the state statute is not sufficient to overcome Supreme Court precedent and the United States Constitution, because it finds it necessary to exaggerate what the state constitutional right is, arguing that this case implicates "a right enshrined in a state's constitution at the direction of the electorate of that state[.]" Maj. Op. ¶ 50. The right to a screen is decidedly found nowhere in our state constitution; that notion is found only in a state statute that, like every single state statute in existence, may not violate the state or federal constitution. *State v. Bd. of Levee Comm'rs for Yazoo-Miss. Delta*, 932 So. 2d 12, 21 (Miss. 2006). Second, the majority points out that "the Iowa statute at issue in *Coy* was discretionary while the statutory procedure at issue in today's case is unambiguously mandatory." Maj. ¶ Op. 39. But the Court in *Coy* specifically noted that individualized findings must be made to attempt a justification for chipping away at Confrontation Clause rights, and a mandatory statute leaves no room for a court to do that, while a discretionary statute leaves open the possibility of the trial court making individualized findings; those findings simply were not made in *Coy* despite the discretionary nature of the statute. Thus, the mandatory nature of the statute at issue today renders it even more constitutionally problematic than the statute at issue in *Coy*, not less so. Third, the majority points out that the victims in *Coy* were thirteen years old and attacked by an unknown assailant, while the case at hand involves a four-year-old allegedly attacked by her father. Maj. Op. ¶¶ 41-42. Perhaps these distinctions would be important to our analysis had the trial courts in either case actually made individualized findings. But neither did so. The statute at issue in today's case applies mandatorily and equally to four

33

year olds confronting their fathers and to thirteen year olds confronting an unknown assailant. The clear reasoning behind the Supreme Court precedent is that individualized findings should be made in cases that strip defendants of face-to-face confrontation of child witnesses, and those were made in neither *Coy* nor in today's case.

¶72. In *Craig*, the United States Supreme Court upheld a conviction after examining a state statute permitting the use of one-way closed circuit television to prevent a child witness from face-to-face confrontation with the defendant upon a "determination that the child witness will suffer 'serious emotional distress such that the child cannot reasonably communicate[.]'"[12] *Craig*, 497 U.S. at 856 (quoting Md. Code Ann., Cts. & Jud. Proc. § 9-102(a)(2)(ii)). The Court held that:

> if the State makes an adequate showing of necessity, the state interest in protecting child witnesses from the trauma of testifying in a child abuse case is sufficiently important to justify the use of a special procedure that permits a child witness in such cases to testify at trial against a defendant in the absence of face-to-face confrontation of the defendant.

*Id.* at 855. The Court proceeded to emphasize that the "requisite finding of necessity must of course be a case-specific one: The trial court must hear evidence and determine whether use of the [special procedure] is necessary to protect the welfare of the particular child witness who seeks to testify." *Id.*

---

[12] In that case, the prosecution presented expert testimony describing how the multiple child witnesses would meet this standard, including that one child "would probably stop talking and she would withdraw and curl up" and that another would "become highly agitated, that he may refuse to talk[,]" and another would "become extremely timid and unwilling to talk." *Id.* at 842 (internal quotation marks omitted).

¶73. Under *Coy* and *Craig*, the State cannot invoke the mandatory language of Section 99-43-101(2)(g) to bypass presentation of case-specific evidence that the use of the screen is necessary to prevent trauma to the particular witness.[13] "[S]omething more than the type of generalized finding underlying such a statute is needed when the exception is not 'firmly . . . rooted in our jurisprudence.'" *Coy*, 487 U.S. at 1021 (quoting ***Bourjaily v. United States***, 483 U.S. 171, 183, 107 S. Ct. 2775, 2782, 97 L. Ed. 2d 144 (1987)). The State relied heavily on the mandatory nature of the statute and did not present evidence of necessity for the screen that would support a variance from the result the United States Supreme Court reached in *Coy*. The State's argument that the use of the screen would help the child focus does not constitute a public policy interest sufficient to override a defendant's right to face-to-face confrontation. Application of an exception requires a case-specific finding that the presence of the defendant in the courtroom would be the source of trauma to the child. Confusingly, the majority finds that "[w]e grant wide discretion to trial judges. on such matters because ['][e]ach case must depend upon its own circumstances[.][']" Maj. ¶ Op. 58. But the trial judge had no discretion on this matter, as the statute is mandatory and uses "shall," and the case did not depend upon its own circumstances, but on a *general* policy finding of trauma.

---

[13] In closer alignment with controlling Confrontation Clause jurisprudence, Mississippi Rule of Evidence 617 outlines a procedure permitting a child's testimony via closed-circuit television if certain conditions are met, including that the topic of testimony "is that an unlawful sexual act contact, intrusion, penetration, or other sexual offense was committed on the child" and that "there is a substantial likelihood that the child will suffer traumatic emotional or mental distress if compelled to testify . . . in the presence of the accused." MRE 617(a). Further, the rule requires that "the court must: **(A)** conduct a hearing *in camera*; and **(B)** make specific findings of fact, on the record as to the basis of the ruling." MRE 617(b)(2).

The trial judge even clearly noted his concern that the statute was unconstitutional, but pointed to his lack of discretion as reasoning for using the screen. Ultimately, the evidence supported that the child witness would be excited, not traumatized, to see her father and would be distressed at not being allowed to interact with him.[14]

¶74. The true legal question on appeal is whether this Court is bound by the controlling precedent of the Supreme Court of the United States. It should be without question that we are so bound. *See Czekala-Chatham v. State*, 195 So. 3d 187 (Miss. 2015); *Hicks v. Miranda*, 422 U.S. 332, 343-45, 95 S. Ct. 2281, 45 L. Ed. 2d 223 (1975). An exception to the protections of the Confrontation Clause cannot be created by a "legislatively imposed presumption of trauma." *Coy*, 487 U.S. at 1021. Here, the use of a screen to block the complaining witness's view of the defendant during trial was substantially similar to the circumstances of *Coy* that constituted reversible error according to the United States Supreme Court.

---

[14] At this point, I note a concern with the supplemental *certiorari* brief filed by the State. When arguing that the trial court heard sufficient evidence at the tender-years hearing that the child would be traumatized by viewing the defendant, the State's supplemental brief asserts that "[t]he trial court also heard A.G.C.'s mother's testimony that A.G.C. 'was very distraught over the fact that she would have to come to court and testify with her daddy in the courtroom.'" This partial quotation as extracted creates an impression in the reader that the mother testified the child would be distraught out of aversion to the presence of the defendant. But the full quotation of the excerpt of the mother's testimony is: "[s]he was very distraught over the fact that she would have to come to court and testify with her daddy in the courtroom and not be able to talk to him." Attorneys certainly are expected to present the most favorable view of the facts reasonably possible for their clients. But attorneys also have a professional responsibility to avoid extracting quotations in a misleading manner that falls short of their duty of candor to the Court.

¶75. In the absence of evidence supporting an individualized finding that the screen was necessary to prevent trauma to the particular child witness, we should reverse the judgments of the Court of Appeals and of the Rankin County Circuit Court and remand the case for a new trial. Accordingly, I dissent.